# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-DP-00815-SCT

*JOSEPH BISHOP GOFF*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/06/2005 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL BY: ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: PATRICK JOSEPH McNAMARA MARVIN L. WHITE |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/28/2009 |
| MOTION FOR REHEARING FILED: | 06/29/2009; DENIED AND OPINION MODIFIED BY DELETING FOOTNOTE 24 AND DUPLICATE CITATIONS IN ¶153 - 08/27/2009 |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1. Joseph Bishop Goff was convicted by the George County Circuit Court in the capital murder of Brandy Stewart Yates during the commission of a robbery and was sentenced to death by lethal injection.[1]

---

[1] Goff also was convicted of second-degree arson and sentenced to ten years.

¶2.     Goff raises twelve issues on appeal:

**I.      The trial court erred in failing to suppress evidence which resulted from the unreasonable seizure that violated Goff's rights pursuant to the Fourth Amendment to the Constitution of the United States and Section 23 of the Mississippi Constitution of 1890.**

**II.     The trial court erred in permitting Goff to act as his own attorney at trial.**

**III.    The evidence in this case is insufficient to prove that Goff is guilty of capital murder.**

**IV.     The prosecutor committed misconduct in improper questioning on voir dire, improper opening statement on victim character, improper closing argument on juror "promise," and argument outside the record.**

**V.      Goff received ineffective assistance of counsel.[2]**

**VI.     The trial court erred by refusing to grant a properly submitted circumstantial-evidence (two-theory) instruction.**

**VII.    The refusal of the trial court to grant an instruction embodying the theory of defense constitutes reversible error.**

**VIII.   The death sentence in this case must be vacated because the indictment failed to charge a death-penalty-eligible offense.**

**IX.     Goff's execution by lethal injection, under the current Mississippi protocol, would violate the First and Eighth Amendments to the United States Constitution, corresponding provisions of the Mississippi Constitution, and state law.**

**X.      Error was committed when certain aggravating factors were submitted to the jury.**

---

[2] Goff identifies eight areas in which he contends trial counsel was ineffective.

**XI. The sentence of death is disproportionate when compared with other cases in which the death penalty has been imposed in Mississippi, taking into consideration the unique characteristics of Joseph Goff.**

**XII. Cumulative error requires reversal of the conviction and sentence in this matter.**

## FACTS AND PROCEDURAL HISTORY

¶3. On August 1, 2004, Brandy Stewart Yates left her husband of eight years, James Yates, Jr., and their two young children to travel with defendant Joseph Goff. Brandy had become acquainted with Goff while working as a waitress at the Bama Barn, a bar in Theodore, Alabama.[3]

¶4. On August 26, 2004, at 3:53 p.m., Brandy checked into room 121 at Rocky Creek Inn in Lucedale, Mississippi, accompanied by Goff.[4] Sometime later in the day, after the two had an altercation, Goff left the motel and traveled to Mobile, Alabama, where he met an acquaintance, a woman by the name of Melissa.[5]

---

[3] During an August 2, 2004, telephone conversation, Brandy informed James that she was unhappy, that she had left with someone else, and that she would not be coming home.

[4] Pearl Boulware was working the front-desk at the motel when Brandy checked into the motel. She testified that Brandy completed a registration form and provided her driver's license, which Boulware photocopied on the back of the registration form. Boulware stated that she provided Brandy with one room key.

[5] Goff explained to Detective Ronnie Lambert that he ran into Melissa, put her up in a motel room in Mobile, and went straight back to the Rocky Creek Inn. Detective Lambert later spoke with Melissa, who confirmed that Goff had put her up in a motel. Melissa also said that Goff had gone to the store and bought her some groceries before he left. According to Melissa, at approximately 8:30 p.m. and while they were in the store, Goff received a phone call, and thereafter his entire demeanor changed.

3

¶5.     Throughout the evening of the twenty-sixth, Brandy spoke by telephone with her husband James numerous times.  According to James, Brandy first called him collect between 6:30 and 7:30 p.m.  During this first conversation, which lasted about an hour, Brandy told James that Goff had slapped her earlier in the day, that he had dropped her off at the motel and left, and that she was afraid he was going to hurt her.  The second call, which occurred approximately an hour after the first, ended abruptly, due to a knock on Brandy's door.[6]  The third call, which lasted about one hour, took place shortly after the second call.  During this third call, James and Brandy made plans for him to pick her up early the following morning, August 27, 2004.

¶6.     Around 11:30 p.m. on August 26, Goff[7] approached the motel's front desk and stated that he and his girlfriend were locked out of room 121.  Margaret Clark, a desk clerk, made Goff a key.  About three minutes later, Goff returned, stating that he was still unable to get into the room.  Clark made a second key.  When Goff returned for the third time, Clark inquired as to whether anyone else was in the room.  Goff answered positively, and she

---

[6] Pearl Boulware, a desk clerk at the motel, testified that Brandy received several telephone calls throughout the evening of the twenty-sixth.  The caller, a male, asked Boulware to ring Brandy's room, but it was busy each time.  After several calls, the man asked Boulware to walk to the room and "see if [Brandy] was okay." Boulware knocked on the door twice, but no one answered.  As she turned to leave, Brandy opened the door and according to Boulware, appeared as if she had been crying.

[7] On August 27, Margaret Clark identified a photograph of Goff as being the man who had visited the front desk the night before.

4

informed him that the reason he was unable to get into the room was that the door was locked from the inside. Clark never saw Goff again.

¶7. According to James, later in the evening on the twenty-sixth and in the early morning hours of August 27, he tried to call Brandy three additional times, but never reached her. When James tried to call around midnight, a male answered the phone. Because he did not want to cause trouble, James hung up. James tried twice more to reach Brandy around 4:30 and 5:30 a.m. on the twenty-seventh. When he was unable to reach Brandy, James called the front desk for assistance. The clerk informed him that the telephone in the room was off the hook.

¶8. On the morning of August 27, Dee Dee Wall, owner of the Rocky Creek Inn, noticed what appeared to be fire damage in room 121. Wall used the housekeeping key to enter the motel room. Upon entering the room, Wall noticed that the room was burned and that there was a body lying on the floor between the two beds. Wall immediately returned to the motel lobby and called 911.

¶9. The 911 call was received at approximately 8:45 a.m. The call advised of a fire and a possible body in a room at the Rocky Creek Inn. Numerous officers responded, including George County Sheriff Gary Welford, who arrived at approximately 8:55 a.m.

¶10. Detective Ronnie Lambert, an investigator with the George County Sheriff's Department, also responded. When Detective Lambert arrived on the scene at approximately 9:10 a.m., Sheriff Welford and three other detectives were already there. The scene had not yet been secured, but a deputy was standing outside the motel room. Detective Lambert, the

5

county coroner, and another detective entered the room, photographed the scene, secured the room with barrier tape, and instructed an officer to stay outside the room to prevent anyone else from entering.

¶11. The investigation continued throughout the day, and at approximately 3:45 p.m., Detective Lambert contacted the sheriff's department and had the dispatcher enter Goff and his vehicle into the system.[8] Detective Lambert had identified the victim as Brandy Yates based on the registration materials from the motel–a copy of Brandy's license was photocopied on the reverse side of the registration card–and had learned from the motel clerk that Brandy had arrived at the motel in a white Ford Mustang.

¶12. Around 3:00 p.m. on August 27, and as the investigation continued in George County, Trooper Jason Ginn of the Mississippi Highway Patrol saw a white Ford Mustang traveling west on Interstate 20 near Vicksburg, Mississippi. Trooper Ginn noticed that the car had a temporary tag, which was defaced. Trooper Ginn, who was parked in the median, pulled into traffic and caught up with the Mustang. While he was unable to read the issuing state on the tag, Trooper Ginn could see that the expiration date was August 20, 2004. Because the current date was August 27, 2004, it was clear that the tag was, in fact, expired.

---

[8] Detective Lambert's testimony indicated that, through the assistance of authorities in Alabama, he obtained a photograph of Goff at approximately 3:30 p.m., which he then showed to Clark. After she identified the person in the picture as the individual she saw traveling with Brandy, Detective Lambert contacted the sheriff's department dispatcher to have Goff entered in the National Crime Information Center (NCIC).

¶13.    At this point, Trooper Ginn initiated a traffic stop. The driver let down the passenger-side window, and Trooper Ginn noticed the strong smell of cigarette smoke, red marks on the driver's neck, and that the vehicle was "trashed" on the inside. The driver stated to Trooper Ginn that he was on a "spiritual experience" and traveling to Texas.

¶14.    Concerned by this strange response and his observations of the driver and the condition of the vehicle, Trooper Ginn asked for a driver's license, as well as registration for the vehicle, both of which were provided. Trooper Ginn returned to his vehicle with the license and paperwork, contacted the dispatcher in Jackson, and requested a check to see if the license was valid. Upon returning to his patrol car, Trooper Ginn noticed the odor of gasoline on the documents provided. Trooper Ginn again contacted the dispatcher, this time to inquire whether the driver, by this time identified as Joseph Goff, had a criminal record.

¶15.    Trooper Ginn called for backup. While he was in his car waiting for the dispatcher to respond, Trooper Henley arrived. Trooper Ginn informed Trooper Henley of what he had observed, and suggested that Trooper Henley speak with Goff. Trooper Henley did so, and Trooper Henley relayed to Trooper Ginn that Goff had told him that he had approximately $3,000 in cash on him, that he was a convicted felon, and that he had just been released from prison for shooting someone.

¶16.    After speaking with the dispatcher, and after being informed of the conversation between Trooper Henley and Goff, Trooper Ginn returned to Goff's vehicle and asked whether Goff had any stolen merchandise, weapons, or drugs in the vehicle. Goff responded that he did not.

7

¶17.   Trooper Ginn then requested and received permission to search Goff's vehicle. Shortly after the search began, and before the search was complete, Trooper Henley had to leave the scene to assist in another traffic stop. Because searches are not conducted when only one officer is on the scene, Trooper Ginn explained to Goff that the search would be delayed.

¶18.   During this approximately fifteen-minute intermission (while another officer was en route to the scene), Trooper Ginn and Goff continued to converse. Trooper Ginn asked Goff why the paperwork smelled like gasoline, to which Goff responded that he kept a gas can in the back of the car in case he ran out of gas. During this response, Goff also mentioned his girlfriend, which prompted Trooper Ginn to ask "well, where's she at now?" At this point, Goff's entire demeanor changed–going from talkative to very quiet. Goff responded that he had "lost" her in Lucedale. Goff explained that the day before, he and his girlfriend had stopped in Lucedale and checked into a motel room, but that after they had gotten into a fight, he had left. Trooper Ginn then asked Goff, "[w]ell, aren't you going to go back and pick her up?" Goff never responded. Puzzled, and concerned that Goff's girlfriend might be injured, Trooper Ginn contacted the authorities in southern Mississippi to determine whether they were searching for Goff.

¶19.   After Trooper Ginn learned from the George County Sheriff's Office that Goff was a person of interest in the murder of Brandy, he put Goff under arrest. In all, the traffic stop lasted just less than one hour.

8

¶20.    After being informed of Goff's arrest, Sheriff Welford sent two investigators to Vicksburg to retrieve Goff and his vehicle. Early on the morning on August 28, 2004, Goff arrived at the George County Sheriff's Department. Upon arrival, Goff was given *Miranda* warnings and thereafter interviewed by Detective Lambert. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶21.    During this interview, Goff explained that the marks on his body had been inflicted by Brandy during a physical altercation that had occurred shortly after they arrived at the motel, during which he had slapped her on the head. Goff indicated that the altercation began with him accusing Brandy of being sexually unfaithful to him and not wanting to be with him anymore. According to Goff, after the altercation, he left. Upon returning to the motel later that night, the first thing Goff noticed when he opened the motel room door was a note written by Brandy. It was not until after he had shut the door behind him that he noticed a "smell." Goff proceeded to describe the scene and the state of Brandy's body. He stated that body "was mutilated, . . . the face and everything crushed in." In particular, Goff said that it "looked like someone had reached in through a hole in her chest and pulled out all her organs and slung them all over the room."[9] After he found Brandy's body, Goff proceeded to lie on top of her body for over an hour and "just [hold] her." He stated, "I laid

---

[9] Detective Lambert testified that this statement stood out to him, because investigators did not know for several hours how the organs were removed from Brandy's body– "[W]e had no idea at that time that those large organs and intestines had been removed from that hole–until much later that night when the body was actually removed from the scene."

there and held her . . . kissed her head and everything else . . . before I got up." Goff explained that he then became worried that he would be considered a suspect. "So I stole everything out of the room that might have had my fingerprints on it and wiped the room down,"he said. Goff said he then placed the items inside his vehicle. He then backed the car up to the front of the room, grabbed a pair of white gloves that he had with him in the car, along with a gas can. Goff said he went back into the room, "poured the gas, threw the can and set it on fire[,]" and then left.

¶22. A George County grand jury handed down a two-count indictment against Goff on October 19, 2004, charging him with capital murder, with the underlying felony being robbery, and second-degree arson. At his arraignment on November 30, 2004, Goff pleaded not guilty to both charges. At pretrial hearings on April 7, 2005, the court heard numerous defense motions, including several motions to suppress and a motion to quash.

¶23. On Monday, May 2, 2005, jury selection began in the George County Circuit Court, Circuit Judge Dale Harkey presiding.

¶24. After the jury had been empaneled, Goff informed the judge that he would like to "exercise [his] constitutional right to represent [himself]" and proceed pro se. The trial judge thoroughly examined Goff to ensure that he was knowingly, intelligently, and voluntarily waiving his right to counsel. The trial judge ultimately determined that Goff was competent to waive his right to counsel, but cautioned Goff that he was "asking to represent [himself] at trial on the most serious felony crime that can be committed" and that Goff would be placed at a "serious disadvantage" by proceeding pro se. The judge then authorized Goff's

10

attorneys, Jeff Deen and Scott McNally, to act as co-counsel, and directed them to remain and provide Goff with "any support, assistance, and advice that you deem sufficient to seek from them."[10]

¶25.    Dr. Stephen Hayne performed the autopsy and determined that the cause of Brandy's death was four slash wounds to the neck, which cut through two major blood vessels, the left jugular vein and the left common carotid artery.

¶26.    In addition to the lethal slash wounds, Dr. Hayne found that Brandy had suffered numerous other injuries, including gaping wounds inflicted by blunt-force trauma over the right facial area, the front surface of the neck, and the right-middle-to-lower chest wall. Numerous bone fractures were present in the facial area, the right chest wall, and the rib cage. Brandy's teeth were knocked out. Fragments of charred toothpicks were located in the neck and facial area. A small silver metal screw and two pieces of splintered wood were removed from Brandy's scalp hair. Organs, including portions of the small and large bowels and the spleen, had been torn out of Brandy's body via the hole in her chest. Charring injuries were present over the entire body.

¶27.    The jury also heard the testimony of two Mississippi Crime Laboratory investigators. Stacy Smith, forensic scientist with the Mississippi Crime Lab, arrived at the motel at approximately 1:00 p.m. on August 27, 2004. Upon entering the motel room, Investigator Smith noticed that a layer of soot covered the entire room, that the curtains, beds, lamps, and

---

[10] Deen and McNally were privately retained by Goff's mother, Lessie Goff.

11

floor were damaged, and that the victim's feet were visible on the floor between the beds. The victim's organs also were lying on the floor throughout the room.

¶28. Physical evidence recovered during Investigator Smith's search of the crime scene and later introduced at trial included a pillow without a pillowcase, a bag of toothpicks as well as toothpicks lying in the room, a gas can, a pack of cigarettes, a metal drawer track which appeared to contain bloody fingerprints, tissue and blood, and two white, two-holed buttons. Numerous photographs of the motel room taken by Investigator Smith also were admitted into evidence and presented to the jury.

¶29. In addition to conducting the investigation of the motel room, Investigator Smith searched Goff's vehicle.[11] Found on the passenger seat was a blue-flannel shirt, underneath which was found a white pillowcase. Inside the pillowcase was a shirt, a piece of wood containing what appeared to be blood and tissue, and an Econolodge notepad containing a note from Brandy.[12] On the passenger-side floorboard, a baseball cap, two shoes, a white glove containing reddish stains, and an empty pizza box were found. The bottom of the left shoe appeared to have blood and tissue located between the treads. Also recovered from Goff's vehicle was a plastic trash bag, which contained cigarette butts, pizza crust, and a pink-colored blade-guard from a disposable razor.

---

[11] The vehicle was secured with evidence tape, which was initialed by the officer who escorted the vehicle from Vicksburg to Lucedale. Investigator Smith broke the seal.

[12] The note stated "Joseph, went to see kids. Be back soon."

¶30. With regard to the shirt found inside the pillowcase, Investigator Smith testified that there was a large amount of a "reddish substance, what appears to be blood" on the front of the shirt, and that the back of the same shirt contained smaller stains of what also appeared to be blood. Investigator Smith noted that the shirt was missing four white, two-holed buttons, which appeared to be the same as the buttons recovered from the motel room.

¶31. Also recovered from the vehicle was a woman's wallet, which Investigator Smith said was found in the area of the console. The wallet, which was removed from the vehicle and released to the investigator on the scene, contained Brandy's driver's license, her social security card, photos of her children, the children's birth certificates, their medicaid cards, her social security card, a carrot-cake recipe, and $509 in cash (ten fifty-dollar bills, a five, and two ones), and two dollars in quarters.

¶32. Paige Bowlus, a forensic biologist at the Mississippi Crime Lab, examined the items of physical evidence seized in an attempt to locate possible biological material and to collect and preserve such material so that DNA analysis could be performed.

¶33. Upon a visual examination of the metal track, Investigator Bowlus noticed a reddish-brown stain. She collected the stain, tested it and identified it as human blood. Investigator Bowlus swabbed the right shoe recovered from Goff's vehicle, and it also was identified as human blood. Investigator Bowlus testified that, while she visually had examined the tread of the left shoe and noticed that it was caked with a tissue-like substance and reddish-brown stains, she had not tested it so as to leave the impression of the shoe print undisturbed. She also noted that the shirt recovered from Goff's vehicle was "saturated with stains," and stated

13

that the many patterns of brown and red on top of each other indicated the presence of tissue and coagulated blood.

¶34.    No DNA testing was performed on any of the evidence, and the testing conducted did not identify the source of the blood.[13]

¶35.    During the trial, Goff presented evidence implying that James had traveled to Lucedale and killed his wife.  Goff sought to elicit testimony from James that he and Brandy had a history of domestic violence and that the police had been called to their residence on at least one occasion.[14]

¶36.    On May 5, 2005, the jury found Goff guilty on both counts–capital murder and second-degree arson.

¶37.    On May 6, 2005, the trial court conducted a separate sentencing hearing, as required in capital cases.[15]  As proof of aggravating factors, the State presented evidence that Goff had been convicted of prior violent crimes, including second-degree assault and discharge of a gun in an occupied building and vehicle; that Goff's act of setting the motel on fire knowingly had created a great risk of death to many persons; that the capital offense had been committed while engaged in the commission of the crime of robbery; that Goff had

---

[13] Detective Lambert testified that the original request for DNA testing was withdrawn once he determined that Goff was in the motel room and that Goff had lain on top of Brandy.

[14] James stated that he and Brandy had "disagreements and arguments;" however, he testified that they did not engage in "physical fighting."

[15] The judge sentenced Goff to ten years upon his conviction by the jury for second-degree arson.

committed the capital offense to avoid a lawful arrest; and that the capital offense had been especially heinous, atrocious, and cruel.

¶38. Initially, Goff directed his counsel not to present mitigation evidence to the jury. Goff eventually changed his mind, however, and defense counsel presented evidence that Goff had had a tumultuous childhood; that Goff was the child of an incestuous relationship; that, despite his average intelligence, Goff suffered from serious mental illness; and that Goff had been suffering from a psychotic episode when he killed Brandy.

¶39. At the conclusion of the sentencing phase, the jury found that the following aggravating circumstances existed: (1) Goff previously was convicted of a felony involving the use or threat of violence to the person; (2) Goff knowingly had created a great risk of death to many persons; (3) the capital offense had been committed while Goff was engaged in the commission of a robbery; (4) the capital offense had been committed to avoid or prevent lawful arrest; and (5) the capital offense had been especially heinous, atrocious, and cruel. The jury found that Goff should be sentenced to death.

¶40. Goff's post-trial "Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial" was denied on June 30, 2005. Goff now appeals to this Court, in forma pauperis, represented by the Mississippi Office of Capital Defense Counsel.

**STANDARD OF REVIEW**

¶41. Convictions for capital murder are reviewed under a heightened standard of review. "The standard for this Court's review of an appeal from a capital murder conviction and death sentence is abundantly clear. On appeal to this Court, convictions upon indictments for

15

capital murder and sentences of death must be subjected to 'heightened scrutiny.' *Loden v. State*, 971 So. 2d 548, 562 (Miss. 2007) (quoting *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992)). Under this standard of review, all doubts are to be resolved in favor of the accused, because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id*. (quoting *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978)).

## DISCUSSION

### I.     Failure to Suppress Evidence Resulting from the Seizure

¶42.    Goff contends that the traffic stop which led to his arrest constituted an illegal seizure under the Fourth Amendment to the United States Constitution, and therefore, all evidence collected therefrom should have been suppressed by the trial court. In particular, Goff claims that the stop of his vehicle by Trooper Ginn was improper, that the length of his detention was unreasonable, and that the consent to search was invalid.

### A.     Procedural bar

¶43.    Goff, through counsel, submitted numerous pretrial motions, including a motion to suppress all evidence retrieved from Goff's vehicle. At the conclusion of the evidentiary hearing, the trial judge denied Goff's motion, finding that all evidence generated as a result of the traffic stop was admissible. At trial, Goff did not renew his objection to the admission of any evidence taken from his vehicle.

16

¶44.   The State responds that this challenge is procedurally barred due to Goff's failure to challenge the admissibility of the evidence when offered at trial.[16]

¶45.   While Goff did not object to the admission of any evidence taken from his vehicle at trial, we find that the pretrial proceedings were sufficient to preserve the issue for appeal.

¶46.   This Court has held that a defendant's motion in limine regarding the introduction of evidence properly preserved the issue for appeal, and an objection was not necessary. *Kettle v. State*, 641 So. 2d 746, 748 (Miss. 1994). "While it would have been preferable, and by far the safer practice for Kettle to have renewed his objection, we find the error in this case was sufficiently preserved by language of the motion in limine, which the court overruled . . . ." *Id*. The *Kettle* opinion then quoted with approval the explanation of the rule given by the Colorado Supreme Court in *Uptain v. Huntington Lab., Inc.*:

> Presentation of issues by means of motions in limine offers opportunities to expedite trials, eliminate bench conferences, avoid juror annoyance and permit more accurate rulings . . . . When, as here, a specific evidentiary issue is presented to the trial court in advance of trial, the primary purposes of the contemporaneous objection rule–to permit the trial court to accurately evaluate the legal issues and to enable the appellate court to apprehend the basis of the objection–are satisfied. Requiring an additional formal objection and ruling in all cases would undermine the benefits provided by the motion in limine procedure. We conclude that under the circumstances of this case, where the issue of the admissibility of the specific evidence was fully argued at the trial court on the same grounds argued by the non-prevailing party on appeal, the plaintiff's motion in limine constituted a timely objection . . . .

*Id*. (quoting *Uptain*, 723 P.2d 1322, 1330-31 (Colo. 1986)); *see also* *Lacy v. State*, 700 So. 2d 602, 606 (Miss. 1997).

---

[16]   The State points out that Goff, in fact, offered to stipulate to the admissibility of the items at trial.

17

**B. On the merits**

¶47. The standard of review for the suppression of evidence is abuse of discretion. *Chamberlin v. State,* 989 So. 2d 320, 336 (Miss. 2008) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003)).

¶48. A traffic stop may constitute a seizure under the Fourth Amendment when a "reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). "An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 659, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)). The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. *Whren*, 517 U.S. at 813.

¶49. The United States Supreme Court has held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). This Court adopted that federal standard. *Jackson v. State*, 418 So. 2d 827, 830 (Miss. 1982). "As a consequence of adopting the voluntariness test for consent searches, the

18

[United States Supreme] Court concluded that 'while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.' That is, consent may be established without a showing that the police warned the consenting party of his Fourth Amendment rights or that he was otherwise aware of those rights." **Jones v. State ex rel. Miss. Dep't of Pub. Safety**, 607 So. 2d 23, 27 (Miss. 1991) (quoting **Schneckloth**, 412 U.S. at 249); *see also* **Logan v. State**, 773 So. 2d 338, 343 (Miss. 2000); **Graves v. State**, 708 So. 2d 858, 863-64 (Miss. 1997).[17]

¶50. At the suppression hearing in the case sub judice, Trooper Ginn testified that while on patrol on August 27, 2004, he had observed a vehicle traveling westbound on Interstate 20 in Warren County, Mississippi. According to Trooper Ginn, after noticing that the vehicle had a temporary tag, which appeared to have been altered and which was expired, he had initiated the stop.

¶51. A routine traffic stop for an expired tag led to other findings which justified further inquiry. Such findings included the red marks on Goff's neck, the appearance of the

---

[17] In support of his argument that the alleged consent to search was invalid, Goff cites **Penick v. State** and **Longstreet v. State**. In **Penick**, this Court stated that "the best way to prove a defendant had knowledge he did not have to consent to the search is for the officer to have told him." **Penick**, 440 So. 2d 547, 550 (Miss. 1983). However, neither this Court, nor the United States Supreme Court, has held that an officer must advise a suspect of his constitutional right to refuse to consent. In **Longstreet**, this Court stated that when a search "is based on consent alone, it is necessary that the person searched be aware of the right to refuse under the law." **Longstreet**, 592 So. 2d 16, 19 (Miss. 1991). We find that **Penick** is merely advisory, and that **Longstreet** is inapplicable in this case, as the search was not "based on consent alone."

19

vehicle's interior, the smell of gasoline, and the unusual responses provided by Goff.[18] Goff told Trooper Ginn that he did not work and that "he was on a spiritual experience."

¶52. Trooper Ginn asked Goff if he had any drugs, weapons, or stolen merchandise in the vehicle. Goff responded that he did not. Trooper Ginn then proceeded to request, and receive, consent to search Goff's vehicle.[19] The totality of the search of Goff's vehicle by Trooper Ginn consisted of opening a carton of cigarettes as well as searching the center console of the vehicle, wherein three bank-rolls of fifty-dollar bills were found. The search ended after the rolls of money were found, because Trooper Henley had to leave the scene to respond to another incident. Trooper Ginn testified that he then removed the money and handed it to Goff.

¶53. Thereafter, Trooper Ginn was informed by the George County Sheriff's Office that Goff was a person of interest in the murder of Brandy. Goff was arrested, and Troop Ginn

---

[18] Goff, himself, admitted during the suppression hearing that the tag was indeed expired. Goff's license came back as being valid. However, Trooper Ginn was informed that Goff had a lengthy criminal history, e.g., "he had multiple breaking and entering charges showing on his criminal history, menacing, stolen property charges, assault, and charges involving a firearm." The dispatcher also informed Trooper Ginn that they could not find any record on file of the Mustang Goff was driving.

[19] Trooper Ginn testified that he had requested permission to search Goff's vehicle based on the condition of the temporary tag, the fact that no record existed for the vehicle, the large amount of cash in Goff's possession, the fact that Goff was destined for Texas, and Goff's demeanor in general.

secured his vehicle.  Trooper Ginn's involvement ended when George County officials arrived and took custody of Goff and the vehicle.[20]

¶54.    At the conclusion of the suppression hearing, the trial judge determined that Trooper Ginn had initiated the traffic stop properly going on to conclude that the detention was reasonable under the circumstances.

¶55.    The trial court found that the stop of Goff's vehicle was proper, that the length of the detention was reasonable, and that the consent to search was valid.  *See **Whren***, 517 U.S. at 810 (citing ***Prouse***, 440 U.S. at 659) ("[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); ***Schneckloth***, 412 U.S. at 227 ( "the question whether a consent to a  search was in fact 'voluntary' . . . is a question of fact to be determined from the totality of all the circumstances"). The trial court did not abuse its discretion by admitting the evidence in question, and this argument is without merit.

> **II.    Waiver of Counsel, Competency to Proceed Pro Se, and Failure to Order a Mental Competency Examination and to Conduct a Competency Hearing**

¶56.    Goff argues that the trial court erred when it allowed him to waive his Sixth Amendment right to counsel and proceed pro se.  Goff also claims that the trial court should

---

[20]  A search warrant was obtained for Goff's vehicle upon arrival in George County. Forensic scientist, Stacy Smith, conducted a search of the vehicle, pursuant to the warrant. It was during this search that numerous articles of evidence, including the wallet and the bloody shirt, were seized.

have ordered a mental-competency evaluation and conducted a competency hearing.

## A. Waiver of counsel and right to proceed pro se

¶57. While Goff presents the issue as whether the trial court erred when it allowed him to waive his Sixth Amendment right to counsel and proceed pro se, we find that the actual issue is whether the "hybrid representation" Goff received during trial provided him with effective assistance of counsel. *See Metcalf v. State*, 629 So. 2d 558, 564 (Miss. 1993); *see also United States v. Oreye*, 263 F.3d 669, 671 (7th Cir. 2001).

¶58. A trial court may permit hybrid representation which consists of "the participation by an attorney in the conduct of the trial when the defendant is proceeding pro se." *Metcalf*, 629 So. 2d at 562-63 (citations omitted); *see also* Miss. Const. art. 3, § 26 (1890) ("In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . ."). This Court has set forth various factors to consider in determining whether the trial court granted pro se or hybrid representation:

> [T]he defendant's accessibility to counsel; whether and how often he consults with counsel up to the point of the request; the stage of trial at which he requests a participatory role in his defense; the magnitude of the role he desires to assume; whether the trial court encourages immediate and constant accessibility of counsel; and the nature and extent of assistance of counsel which has been provided up to the point of the request, including both substantive and procedural aid.

*Metcalf*, 629 So. 2d at 565.

¶59. Considering these factors individually, we find that this case is analogous to other cases in which this Court has held that the defendant was not deprived of counsel due to hybrid representation. Deen and McNally, Goff's privately retained attorneys, were present

22

at Goff's counsel table during the entire trial, and Goff consulted with them on several occasions. *See **Dunn v. State***, 693 So. 2d 1333, 1342 (Miss. 1997); ***Metcalf***, 629 So. 2d at 565. Both Deen and McNally provided substantial assistance before trial. *See **Dunn***, 693 So. 2d at 1342. They filed numerous pretrial motions and represented Goff at two pretrial hearings. After Goff filed a motion to proceed pro se, which the trial court granted, the trial judge stated:

> [U]nder these circumstances and given the nature of the charges here, I am appointing Mr. Deen and Mr. McNally and directing that they remain to provide you with any support, assistance, and advice that you deem sufficient to seek from them. And also, I will authorize them to act as co-counsel, if that is acceptable to you.

¶60. It is clear from the record that Deen and McNally were not casual observers. Deen conducted voir dire; handled jury challenges; made numerous objections throughout the trial; conducted the cross-examination of Margaret Clark, Trooper Ginn, James Yates, Jr., Dr. Hayne, Investigator Smith, Investigator Bowlus, and Detective Lambert; conducted the direct examination of Dee Dee Wall, Detective Lambert, and Rachel Manders;[21] made the motion for directed verdict; presented the closing argument in the guilt phase; represented Goff at sentencing; made the opening statement on behalf of Goff at sentencing; conducted the direct examination of Lessie Goff and Dr. Van Rosen at sentencing; and filed a motion for a new trial or, in the alternative, judgment notwithstanding the verdict.

---

[21] Manders described herself as Goff's girlfriend.

23

¶61.   McNally participated in the approval of jury instructions and otherwise assisted both Deen and Goff throughout the trial. As already noted, Deen and McNally filed numerous pretrial motions as well.

¶62.   In contrast to the involvement of Deen and McNally, Goff had a limited role throughout the course of the trial.  Goff made miscellaneous objections, but his only direct involvement was conducting the cross-examinations of Pearl Boulware and Sheriff Welford, and making a closing argument, along with Deen, at the guilt phase.

¶63.   Considering the totality of the circumstances, we find that Goff never was actually without counsel.   Deen and McNally were available throughout the entire trial and substantially participated.  The role of each was "not merely that of a skilled  bystander, but of a substantive litigator." *Metcalf*, 629 So. 2d at 565.  Goff, having never been fully without the assistance of counsel, cannot now complain.  He received the best of both worlds—the assistance of counsel while conducting his own defense. *Id*.; *Dunn*, 693 So. 2d at 1342-43, *Metcalf*, 629 So. 2d at 565.

**B.    Competency evaluation**

¶64.   With regard to Goff's claim that the trial court should have ordered a mental-competency evaluation and conducted a competency hearing, we find that the facts of this case did not warrant either.

¶65.   Rule 9.06 of the Uniform Rules of Circuit and County Court Practice provides in pertinent part:

24

> If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
>
> After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial.

Miss. Unif. Cir. & Cty. R. 9.06.

¶66.    What constitutes "reasonable ground" to believe that a defendant is incompetent to stand trial rests largely within the discretion of the trial judge. *See Cox v. State*, 793 So. 2d 591, 597 (Miss. 2001) (citing *Conner v. State*, 632 So. 2d 1239, 1248 (Miss. 1993), (*overruled on other grounds*).[22] The pertinent question is whether "the trial judge receive[d] information which, objectively considered, should reasonably have raised a doubt about defendant's competence and alerted him to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense?" *Conner v. State*, 632 So. 2d at 1248 (citing *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980)).

¶67.    On January 21, 2005, Goff's attorneys filed a motion for a court-ordered mental examination of defendant. The motion stated:

---

[22]  At the time *Conner* was decided, Uniform Circuit Court Rule 4.08 controlled, which did not require that a competency hearing be conducted following a court-ordered mental examination.

25

The attorney for the defendant in this case moves this Court to order a mental examination of defendant to be conducted at such time or times as the Court may direct, by qualified mental health professionals to determine:

(1) The defendant's present mental condition and competency to stand trial; and;

(2) The mental condition of the defendant at the time of the offense, and that the prosecution of this case be stayed depending the outcome of such examination.

As attorney for defendant, I question the defendant's competency to stand trial and believe that it is essential for a mental examination to be conducted in advance of the trial because:

(1) During the course of the investigation for this offense, undersigned counsel has come to believe that defendant has a history of mental illness and that he has been treated by mental health professionals while incarcerated in the State of Alabama.

(2) The defendant has engaged in bazaar [sic] behavior during the past several years;

(3) No mental health clinician has seen the defendant in over six months, during which time the defendant has been confined in the George County, Mississippi Jail.

¶68.    On April 7, 2005, the court heard various motions brought by Goff. Goff testified at this hearing. At the conclusion of the hearing, counsel for Goff, in the presence of the State, requested that an ex parte conference be held regarding a previously-filed motion for a court-ordered mental evaluation. During this ex parte conference,[23] counsel for Goff stated that the horrific nature of the crime prompted him to request the mental examination:

BY COUNSEL FOR GOFF (DEEN): And when I came over here at first to represent him, I told him, due to the horrendousness of the allegation, that we

---

[23] The ex parte conference was transcribed on the record.

26

ought to look into some type of maybe not guilty by reason of insanity or some type of looking into his competency at the time the event was done.

¶69. During the conference, counsel informed the trial court that Goff was a difficult client, that Goff was a child of incest, and that Goff had suffered psychotic episodes. Conversely, counsel also said that he had no trouble communicating with Goff. At the conclusion of this conference, defense counsel amended the previous request for a mental evaluation for the purposes of determining whether Goff was competent to stand trial, so that the requested evaluation was for mitigation purposes only.

¶70. At a second pretrial hearing on April 25, 2005, counsel further explained that he was no longer requesting a mental evaluation for the defendant. Counsel stated that between the filing of the motion on January 21, 2005, and the hearing on April 7, 2005, he "could find no independent background of Mr. Goff where he would have had any psychiatric care or psychologist care or any indication that he would not be competent to stand trial or that he was legally insane at the time of the offense." According to counsel, Goff had been able to assist counsel in his preparation of the defense, Goff had an appreciation of the situation he was in, and the trouble that counsel had communicating with Goff was no different than that with any other client who is under substantial stress.

¶71. During the April 25, 2005, hearing, the trial court granted Goff's previous request for funds for the purpose of securing a mental-health expert to testify during the penalty phase. At the conclusion of this hearing, in commenting on the issue of Goff's competency, the trial judge stated:

27

It was my observation at the hearings conducted April 7th . . . , I did not observe or perceive any untoward conduct on the part of the defendant. He certainly appeared to me to appreciate the nature of the proceedings. He was able to proceed and testify at that hearing, and his responses to the questions that were asked were appropriate and responsive. I didn't see any basis for the Court on its own, sua sponte, bringing up, you know, having a hearing conducted or an examination conducted.[24]

¶72. The trial court did not err in failing to order a mental-competency evaluation or failing to conduct a competency hearing, and Goff's argument is without merit.

### III. Sufficiency of the Evidence

¶73. Goff contends that the prosecution failed to adduce evidence sufficient to convict him of the underlying felony of robbery, as it failed to prove that Goff took any personal property belonging to Brandy. Goff argues on appeal that there was no evidence that Brandy's wallet was ever in the motel room with Brandy, that there was no biological evidence found on the wallet, and that the wallet was never tested for fingerprints.

¶74. Specifically, Goff contends that, because the wallet was not found among the crime-scene items that were found on the floorboard of the vehicle or in the pillowcase found on the passenger seat, that this negates the theory of robbery. Thus, Goff avers that there is a lack of sufficient evidence to support the underlying felony of robbery, and that this Court must therefore hold the evidence insufficient to prove capital murder. We disagree.

---

[24] Dr. Van Rosen testified during sentencing that Goff had a full-scale IQ score of 102, which is in the average or slightly above-average range. In addition, the report prepared by Dr. Rosen, while not admitted into evidence, stated that "[Goff] would be considered competent in most respects to stand trial."

¶75.   In ***Bush v. State,*** 895 So. 2d 836, 843 (Miss. 2005), we reiterated the standard of

review for the legal sufficiency of the evidence:

> In ***Carr v. State,*** 208 So. 2d 886, 889 (Miss. 1968), we stated that in
> considering whether the evidence is sufficient to sustain a conviction in the
> face of a motion for directed verdict or for judgment notwithstanding the
> verdict, the critical inquiry is whether the evidence shows "beyond a
> reasonable doubt that [the] accused committed the act charged, and that he did
> so under such circumstances that every element of the offense existed; and
> where the evidence fails to meet this test it is insufficient to support a
> conviction."  However, this inquiry does not require a court to

>> 'ask itself whether *it* believes that the evidence at the trial
>> established guilt beyond a reasonable doubt.'  Instead, the
>> relevant question is whether, after viewing the evidence in the
>> light most favorable to the prosecution, *any* rational trier of fact
>> could have found the essential elements of the crime beyond a
>> reasonable doubt.

> ***Jackson v. Virginia,*** 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979) (citations omitted) (emphasis in original).  Should the facts and
> inferences considered in a challenge to the sufficiency of the evidence "point
> in favor of the defendant on any element of the offense with sufficient force
> that reasonable men could not have found beyond a reasonable doubt that the
> defendant was guilty," the proper remedy is for the appellate court to reverse
> and render [, i.e. reverse and discharge].  ***Edwards v. State,*** 469 So. 2d 68, 70
> (Miss. 1985) (citing ***May v. State,*** 460 So. 2d 778, 781 (Miss. 1984)); *see also*
> ***Dycus v. State,*** 875 So. 2d 140, 164 (Miss. 2004).  However, if a review of the
> evidence reveals that it is of such quality and weight that, "having in mind the
> beyond a reasonable doubt burden of proof standard, reasonable fair-minded
> men in the exercise of impartial judgment might reach different conclusions
> on every element of the offense," the evidence will be deemed to have been
> sufficient.  ***Edwards,*** 469 So. 2d at 70; *see also* ***Gibby v. State,*** 744 So. 2d 244,
> 245 (Miss. 1999).

When the State's case rests on circumstantial evidence, the evidence must be sufficient to

prove guilt beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis

consistent with innocence.  ***Billiot v. State,*** 454 So. 2d 445, 461 (Miss. 1984).

29

¶76.   Capital murder is defined in Mississippi Code Annotated Section 97-3-19(2).

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> . . .
>
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery. . . .

Miss. Code Ann. § 97-3-19 (Rev. 2006).

¶77.   Robbery is defined in Mississippi Code Annotated Section 97-3-79 as follows:

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . .

Miss. Code Ann. § 97-3-79 (Rev. 2006).

¶78.   The elements of robbery are: "(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property of another from his person or in his presence." *Walker v. State*, 913 So. 2d 198, 223 (Miss. 2005) (quoting *Caldwell v. State*, 481 So. 2d 850, 853 (Miss. 1985)).

¶79.   Under well-settled law, "possession of a deceased's property creates a reasonable inference that the property was stolen." *Spicer v. State,* 921 So. 2d 292, 312 (Miss. 2006) (citing *Knox v. State,* 805 So. 2d 527, 531-32 (Miss. 2002)); *cf. Wilson v. United States,* 162 U.S. 613, 16 S. Ct. 895, 40 L. Ed. 1090 (1896) ("Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, . . . that there is a like presumption in the case of murder accompanied by robbery."). In *Knox*,

we held that, "when the defendant is discovered with the personal property of the deceased on his person it is entirely within reason for the jury to find that this fact in itself constitutes robbery." ***Knox,*** 805 So. 2d at 531-32.

¶80.    Evidence was adduced through the testimony of Investigator Smith that Brandy's wallet was in Goff's possession when he was stopped shortly after Brandy's murder. Smith testified that the wallet was found inside the vehicle in the area of the console alongside items removed from the motel room.

¶81.    The record also discloses that upon registering into the motel, Brandy provided her driver's license; that she was given one room key; and that she returned to the vehicle and drove the vehicle over to room 121. As evinced by Goff's statement to the police, shortly after they entered the motel room an altercation ensued. The record shows that Goff then left and that he later stated to the police, he did so with "intentions of never coming back."

¶82.    According to the record, Brandy was stranded at the motel for approximately eight hours. In that time she had three telephone conversations with her husband, James, during which they discussed plans for him to pick her up the next morning. There was no indication in the record that Brandy ever mentioned being without her wallet, or without money. James testified that Brandy did not use banks, stating, "We always kept our money at home or on us." Among the items, mentioned in the facts, contained in Brandy's wallet, was $509 in cash (ten fifty-dollar bills, a five, and two ones), and two dollars in quarters.

¶83.    The record further reveals that among the numerous items found in Goff's vehicle, which Goff admitted to taking from the crime scene, were an empty pizza box and a plastic

trash bag. Investigator Smith indicated that the trash bag came from inside the motel room. Found inside the trash bag among the cigarette butts and a pink-colored blade guard from a disposable razor, was pizza crust.

¶84. In **Kitchens v. State,** 300 So. 2d 922 (Miss. 1974), we explained this Court's longstanding position with regard to the sufficiency of circumstantial evidence:

> It was long ago held by this Court in the case of **Browning v. State**, 33 Miss. 47, citing Cicely v. State, 13 Smedes & M. 202, 211, and the principle has been uniformly adhered to since that time, that the sufficiency of circumstantial evidence is peculiarly for the determination of the jury, "because it is always solemnly to be weighed and acted upon by their understandings and consciences, and is, from its very nature, the subject of inferences and conclusions in their minds[.]"

300 So. 2d at 926-27 (quoting from **Johnson v. State,** 23 So. 2d 499 (Miss. 1945)).

¶85. Based on our careful and thorough review of the record, the evidence in this case does not "leave indifferent" the hypothesis that, Brandy's wallet, the one item at issue among all the items found in Goff's vehicle that were determined to have been taken from the crime scene, had been left in Goff's vehicle by Brandy. **Lambert v. State,** 462 So. 2d 308, 313-14 (Miss. 1984) (quoting **Sorrells v. State,** 130 Miss. 300, 94 So. 209 (1922)). It follows that there is nothing in the record that points in favor of Goff with sufficient force that no rational trier of fact could have found this essential element of the crime beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence. **Bush v. State,** 895 So. 2d at 843; **Billiot**, 454 So. 2d at 461.

¶86. Thus, on the question of whether sufficient evidence was presented to support the jury's conclusion that Brandy's wallet was in her presence as contemplated by section 97-3-

32

79, at the time of her murder, we find Goff's argument meritless. Miss. Code Ann. § 97-3-79 (Rev. 2006).

¶87.    With regard to the fact that no biological evidence was found on the wallet, and that the State failed to test the item for fingerprints, we reject Goff's argument that this demonstrates a lack of sufficient evidence. We find these facts more properly pertinent to a weight-of-the-evidence claim, rather than a sufficiency-of-the-evidence analysis as to whether a rational jury could have decided that the wallet was in Brandy's presence in the motel room prior to Goff's removing it. While Goff does not argue weight of the evidence, we deem it necessary to address these specific points under this respective analysis.

¶88.    Essentially, when a defendant successfully challenges a jury's verdict based on the weight of the evidence, the defendant is entitled to have a different jury pass on the evidence. *See Smith v. State,* 925 So. 2d 825, 832 (Miss. 2006) ("this Court has not hesitated to invoke its authority to order a new trial and allow a second jury to pass on the evidence where it considers the first jury's determination of guilt to be based on extremely weak or tenuous evidence") (citations & internal quotation marks omitted). However, "the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Bush,* 895 So. 2d at 844. This Court will disturb a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.*

¶89.    Investigator Smith testified on cross-examination that she released the wallet to Detective Lambert at the scene, where he then sealed it. She stated that she did not submit

33

the wallet to the crime laboratory for testing because there did not appear to be any biological evidence of any sort that required such submission. Similarly, the jury had before it the fact that no tests were conducted on the wallet for fingerprints. These were factual questions, with attendant inferences that could have led in any number of directions, for the jury to resolve.

¶90. We find that the lack of biological and fingerprint evidence does not preponderate against the verdict so as to sanction an unconscionable injustice. *Bush*, 895 So. 2d at 844.

¶91. Finally, based on the framing of Goff's argument for this issue, it is unclear whether he seeks to challenge the State's proof with regard to the intent element for the crime of robbery. In support of his argument with regard to the location of the wallet, Goff cites *Young v. Zant,* 506 F. Supp. 274 (M.D. Ga. 1980), *aff'd,* 677 F.2d 792 (11th Cir. 1982). In *Young*, the petitioner sought habeas corpus relief under 28 U.S.C. § 2254, from his death sentence imposed by a Georgia state court, following his jury conviction of murder, armed robbery, and robbery. 506 F. Supp. at 276. The district court granted relief, inter alia, as it pertained to petitioner's sentence, based on its finding that the evidence was insufficient to sustain a conviction based on robbery. *Id.* at 280-81.

¶92. However, based on our reading of *Young*, the decision dealt only with the element of intent, not with whether that victim's wallet was in his presence at the time of the murder. *Id.* at 280-81. Moreover, the district court's stated reasoning for granting relief was based on a finding that the "only relevant evidence presented at trial *indicated* that petitioner did not contemplate the taking of any money until after the shots had been fired and the blows

34

had been struck." *Id.* at 280. (emphasis added). Thus, we find *Young* distinguishable from the matter before us.

¶93. This Court has stated that "the intent to rob, which is required to prove the underlying felony of robbery, can be shown from the facts surrounding the crime." *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005) (quoting *Lynch v. State*, 877 So. 2d 1254, 1266 (Miss. 2004)). Mississippi recognizes the "one continuous transaction rationale" in capital cases. *West v. State*, 553 So. 2d 8, 13 (Miss. 1989). We have construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached . . . ." *Pickle v. State*, 345 So. 2d 623, 626 (Miss. 1977). "An indictment charging a killing occurring 'while engaged in the commission of' one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *Turner v. State*, 732 So. 2d 937, 950 (Miss. 1999) (quoting *West*, 553 So. 2d at 13).

¶94. The State's theory of the case was that Goff went back to the Rocky Creek Inn the night of August 26, 2004, to get back what was rightfully his, the money in Brandy's wallet. The evidence, although circumstantial, supports this theory.

¶95. During the State's case-in-chief, evidence was presented through James's testimony, that after Goff's departure from the motel earlier that afternoon, Brandy feared his return. Based on the motel clerk's testimony, when Goff returned to the motel at approximately 11:30 p.m., he came to the front desk multiple times trying to gain access into room 121, before eventually being told that the door was locked from the inside.

35

¶96. Additional evidence was presented that Goff had received a significant sum of money from his mother for a business that he had planned to start. There also was evidence adduced, still during the State's case, that Goff was supporting Brandy and that Goff was the source of the cash found inside her wallet.

¶97. A number of reasonable inferences could be drawn from the facts surrounding the issue of Goff's intent. While some may be competing is of no matter. As is true in cases based on direct testimonial evidence, any conflicts created by the circumstantial evidence presented were for the jury to resolve. *Ratliff v. State,* 515 So. 2d 877, 882 (Miss. 1987); *see also Kitchens,* 300 So. 2d at 926-27.

¶98. As with the issue regarding the presence of Brandy's wallet, we find nothing in the record that points in favor of Goff with sufficient force that compels us to conclude that no rational trier of fact could have found him guilty on the intent element of robbery beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence. *Billiot,*454 So. 2d at 461; *cf. Bush v. State,* 895 So. 2d at 843.

¶99. Having been properly instructed on the elements of robbery and capital murder, taking the State's evidence as a whole, it was reasonable for the jury to conclude that Goff murdered Brandy while engaged in the crime of robbery. Goff's charge that the evidence in this matter does not support his conviction of capital murder with the underlying felony of robbery is without merit.

**IV.    Prosecutorial Conduct**

36

¶100. Goff alleges that the State committed misconduct in numerous instances and claims that such misconduct deprived him of a fair trial and a reliable sentencing proceeding, thus mandating that his conviction and sentence of death be vacated.

¶101. This Court has held that the failure by defense counsel contemporaneously to object to a prosecutor's remark at trial bars consideration of prosecutorial-misconduct allegations on appeal. *Hodges v. State*, 912 So. 2d 730, 751 (Miss. 2005) (citing *Davis v. State*, 660 So. 2d 1228, 1255 (Miss. 1995)). The rule governing preservation for review provides that if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial. *Id*. (citing Miss. Code Ann. § 9-13-31 (Rev. 2002); *Jackson v. State*, 423 So. 2d 129, 131 (Miss. 1982)). The rationale for this rule is based on the policy of giving the trial judge, prior to appellate review, the opportunity to consider the alleged error. *Id*. (citing *Howard v. State*, 507 So. 2d 58, 63 (Miss. 1987)).

¶102. Goff never raised any objection at trial, or in his motion for a new trial, that the prosecution had engaged in misconduct of any kind, and therefore his claims are barred from consideration on direct appeal. Notwithstanding the procedural bar, the merits of Goff's claims will be addressed.

A. **Victim-impact information during voir dire and opening statement**

¶103. First, according to Goff, the State injected character evidence concerning the victim during voir dire as well as during its opening statement.

¶104. During voir dire, the prosecutor asked the following of the prospective jurors:

37

BY THE DISTRICT ATTORNEY (voir dire): She worked as a cocktail waitress at a bar in Alabama where she worked to help support her family. And you're going to hear that from her husband. And she left 24 days before her death with the defendant.

Now, the question I have for ya'll is, will you hold that against the State of Mississippi that she worked in a bar? Some people just don't like that. Some people think you ought not work in a bar. Can everybody tell me her profession or her career that she was doing at the time will not affect your verdict? Can everybody tell me that? That you can follow the law?

Because the law doesn't say you have the right to life unless you're a cocktail waitress, or you have the right to life unless you left your kids 24 days before with another man. It doesn't say that. It doesn't say that. And I need to know. And it's all right. Again, as the Judge told you, this is America, we can believe what we want. And that's the great thing about our country. But we need to know now. Because if that's going to bother you, we have to know now. So, can everybody tell me they can follow the law as given to you by the Court?

¶105. Later, during the prosecution's opening statement, the district attorney made the following statement:

BY THE DISTRICT ATTORNEY (opening statement): . . . [O]n August the 2nd, Brandy Stewart Yates was 29 years old. She had a husband named James. She had a son eight years old, James IV, and she had a daughter named Sissy. Her mother Carolyn, her father Jack, her sister Crystal, and her brother Jeff loved her dearly and cared for her greatly.

On August the 2nd, they could not understand the decision Brandy had made, a decision to leave her family and go to with that man right there, the defendant that you see in this courtroom.

Now, Brandy, you will hear, was a cocktail waitress at a bar in Alabama. She worked there to help support the family. James worked construction.

She met Mr. Goff at that bar, and for reasons we will probably never know, she made a decision to go with him. But at that time, all the concern, all the love, no one, no one ever dreamed that 24 days later she would lay dead in Room 121 of the Rocky Creek Inn here in Lucedale, Mississippi.

¶106. We find that the questions asked by the prosecutor during voir dire were permissible, as "[o]ur law allows an attorney for either side to probe the prejudices of the prospective jurors to the end that all will understand the jurors' thoughts on matters directly related to the issues to be tried." *West v. State*, 553 So. 2d 8, 22 (Miss. 1989). The prosecution wanted to know whether any prospective juror would be prejudiced against Brandy or the State because she was a cocktail waitress and/or because she had left her husband for another man.

¶107. With regard to the prosecution's opening statement, this Court has held that "the purpose of an opening statement is to inform the jury what a party to the litigation expects the proof to show." *Slaughter v. State*, 815 So. 2d 1122, 1131 (Miss. 2002) (quoting *Crenshaw v. State*, 513 So. 2d 898, 900 (Miss. 1987)). We find that the prosecutor's statement did just this–inform the jury what it expected the evidence to show.

¶108. Furthermore, statements made by counsel during voir dire or during opening argument do not constitute evidence. *See Henton v. State*, 752 So. 2d 406, 409 (Miss. 1999) (closing arguments are not evidence); *Crenshaw v. State*, 513 So. 2d 898, 900 (opening statements are not evidence). This issue is without merit.

**B.      Victim-impact and character evidence during guilt phase**

¶109. Goff also contends that the State, during the guilt phase, formally introduced improper victim-impact and character evidence through Brandy's husband, James. During the State's case-in-chief, James identified himself as Brandy's husband of eight years, reiterated that they had two children together, and stated where Brandy worked as well as what kind of work she did. James's testimony in no way touched upon Brandy's character. Nor did James

39

testify during the guilt phase as to the impact his wife's murder had had on him or his children.[25] This issue is without merit, as the testimony "concern[ed] the background . . . of the victim" and merely set the stage for the presentation of relevant evidence. *Spicer v. State*, 921 So. 2d at 307.

###   C.     Seeking promises from the jury during voir dire

¶110.  Goff alleges that during voir dire, the State sought a promise from the jury that they would be able to convict Goff even in the absence of DNA evidence.  The particular inquiry of which Goff complains is as follows:

> BY THE DISTRICT ATTORNEY (voir dire):  . . . [Y]ou know, if you watch TV a lot, you probably get to watch—I don't know how many of you—how many of you watch CSI?  Well, raise your hand.  See, there's a lot of you.  A lot of you.  It's a very popular show.  My kids love it.  All right.  They're older and they love that show.  They like Law and Order.
>
> But, can everybody tell me that they can separate what they see on TV from what you see in the courtroom?  I know that sounds like a silly question, but some people go, oh, well, it was on CSI, so how come they don't do it in every case?  All right.
>
> And I can tell you how I know, I know CSI and Law and Order are make-believe.  If you flip the channel, you may see Scotty beaming somebody else up, and that's on TV.  All right?

---

[25] James did, in fact, present victim-impact testimony during the sentencing phase of the trial.  This testimony was proper, as recognized by both the Mississippi Legislature and this Court.  Mississippi Code Annotated Section 99-19-157(2)(a) (Rev. 2007) allows for an oral victim impact statement "at any sentencing hearing" with the permission of the courts.  This Court has adopted the United States Supreme Court's holding in *Payne v. Tennessee*, 501 U.S. 808,  111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), and noted that "[a] state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Hansen v. State*, 592 So. 2d 114, 146 (Miss. 1991).

So, can everybody tell me—and, again, this kind of goes to the burden of proof, you know, about what evidence you have—and can everyone tell me that they will listen to the evidence and not speculate because they don't have, say, DNA or they don't have fingerprints and things you may see or hear about on CSI? Can everyone tell me they can do that? Yeah?

¶111. During closing arguments, the State reminded the jury of the question posed during voir dire, stating in part that "[y]ou were asked in voir dire, you all know about CSI. Can you set that aside if it's not needed and return a verdict, and you all said yes. So we ask you to hold to that. It's not necessary here, and it's not needed. The evidence was overwhelming." According to Goff, this tactic of putting jurors in a "box" has long been condemned. In support of this argument, Goff relies on this Court's statement:

> It is an improper influence to put the jury in a "box" by voir dire tactics which extract a promise, prior to trial, to ignore evidence favorable to the defendant. This promise or pledge prevents the jurors from considering all factors relative to the verdict. The jurors are then called upon during closing argument to fulfill that promise, and the effect–whether calculated or not–is to shame or coerce the jury into rejecting factors which would tend to mitigate against the death penalty.

*Stringer v. State*, 500 So. 2d 928, 938-39 (Miss. 1986).[26]

¶112. It is reversible error to ask a juror during voir dire to commit to returning a particular verdict. *Id.* at 938; *see also* *West v. State*, 485 So. 2d 681 (Miss. 1985); *Murphy v. State*, 246 So. 2d 920 (Miss. 1971). Here, however, the prosecutor did not ask the jurors for a promise to convict, nor did he ask the jurors to ignore any piece of evidence; rather, he asked

---

[26] In *Stringer*, the prosecution specifically requested a promise during voir dire for a verdict imposing the death penalty. *Stringer*, 500 So. 2d at 938. During closing argument, the prosecution reminded the jury of their prior promise. *Id*.

the jurors to listen to the evidence and return a verdict based upon the evidence presented at trial.[27] *See* **Taylor v. State**, 672 So. 2d 1246, 1264 (Miss. 1996) (questions did not appear to extract any kind of commitment from the potential jurors, but merely "probed" into their prejudices in order to get some insight into their thoughts); **West v. State**, 553 So. 2d 8, 22 (Miss. 1989) (Our law allows an attorney for either side to probe the prejudices of the prospective jurors to the end that all will understand the jurors' thoughts on matters directly related to the issues to be tried. What is impermissible is for an attorney to attempt to secure from the juror a pledge that, if a certain set of facts occur or are presented, the juror will vote a certain way). Therefore, the admission of this statement was not error.

### D. Argument outside the record

¶113. Goff contends that the State committed misconduct during closing argument when it argued that the only way that the blood could have gotten on the back of Goff's shirt was if Goff had slashed and beaten Brandy. Goff asserts that the prosecutor's argument was unsupported by the record for three reasons: (1) in his statement to police, Goff explained that the blood on the shirt resulted from his lying on Brandy's body after he discovered her murdered in the motel room; (2) no witness testified as to how the blood may have gotten on

---

[27] "The 'CSI effect' is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show CSI: Crime Scene Investigation has on juror behavior. Some have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain." **United States v. Fields**, 483 F.3d 313, 355 n.39 (5th Cir. 2007) (*citing* Tom R. Tyler, Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction, 115 Yale L.J. 1050, 1050 (2006)).

the back of Goff's shirt; and (3) when asked about what appeared to be "droplets of blood" on the back of the shirt, Investigator Smith did not agree with the prosecutor's assessment, stating that the marks were merely "smaller stains."

¶114. During its closing argument, the prosecution argued:

> BY THE DISTRICT ATTORNEY: . . . [F]irst off, the shirt. You can bring the shirt up, please. This is his shirt. Just look at the stain on this shirt. She told you there were droplets. Droplets. All right. These are where the buttons are missing. Does that look like what you would get by laying on somebody? Now, I know he says he was there for an hour and a half, we're going to talk about that in a minute. But that's a lot of blood, members of the jury. That's a lot of blood.
>
> Could you flip to the back, please, sir? The back of the shirt, look at these droplets. That is blood in motion. That is this. (Motioned with arm in a slashing motion.) That's how that gets there. That ain't laying on top of her. How do you get blood on the back of a shirt if you're laying on top of a girl? What did he do? Lay on her and waddle on the back, too? Please. Please. It makes no sense. Use your common sense. That shirt right there tells you, he killed her.

¶115. "The purpose of a closing argument is to fairly sum up the evidence." *Rogers v. State*, 796 So. 2d 1022, 1027 (Miss. 2001). The prosecutor should point out those facts presented by the State "on which the prosecution contends a verdict of guilty would be proper." *Clemons v. State*, 320 So. 2d 368, 371 (Miss. 1975).

¶116. This Court has stated that "[a]n impassioned argument is not in itself an improper argument. Furthermore, the prosecutor, as any other counsel, is free to recall and comment on testimony offered in evidence and to draw inferences. [The prosecutor] may comment upon any facts introduced into evidence. He may draw whatever deductions seem to him proper from these facts . . . ." *Bell v. State* , 725 So. 2d 836, 851 (Miss. 1998).

43

¶117. We find that the prosecutor referred to a piece of validly admitted evidence, the bloody shirt and drew a reasonable inference therefrom; and therefore the prosecutor's statement was permissible. *Id.* at 851. As such, this assignment of error is without merit.

### E. Plain error

¶118. Goff asserts that these errors were so prejudicial that they should be considered as plain error on appeal. As has been stated many times by this Court, "issues not presented to the trial court for lack of contemporaneous objection are procedurally barred, and error, if any, is waived." *Wells v. State,* 903 So. 2d 739, 742 (Miss. 2005) (citing *Ballenger v. State*, 667 So. 2d 1242, 1272 (Miss. 1995)). "We depart from this premise only in unusual circumstances," as a means of preventing a manifest miscarriage of justice. *Dixon v. State,* 953 So. 2d 1108, 1116 (Miss. 2007) (citations omitted). "Such circumstances are required for this Court to consider plain error, despite failure to preserve such error." *Id.* Not only are Goff's assignments of error procedurally barred, they are without merit. Goff may not rely on the plain-error doctrine.

### V. Ineffective Assistance of Counsel

¶119. Listing eight separate claims, Goff contends that he was denied the right to competent counsel as guaranteed by the Sixth Amendment, and that this Court must grant a new trial due to this constitutional infringement and the resulting prejudice.

¶120. The State counters that, with the exception of the first claim, the claims raised by Goff are barred, as they occurred at times when Goff was acting as his own attorney. *See Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 2541 45 L. Ed. 2d 562, 581 n.46 (1975)

44

(noting that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel'"). The State's contention, however, is misplaced. Because each of Goff's ineffective-assistance charges pertains to matters that were addressed at trial by standby counsel, rather than Goff himself, we will not apply *Faretta* in this matter.

¶121. In evaluating an ineffective-assistance charge, this Court applies the two-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064-65, 80 L. Ed. 2d 674, 693-95 (1984) and adopted by this Court in *Stringer v. State,* 454 So. 2d 468, 476-77 (Miss. 1984). Goff must show: (1) that his counsel's performance was deficient, and (2) that this alleged deficiency prejudiced his defense. *Lindsay v. State,* 720 So. 2d 182, 184 (Miss. 1998) (citing *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064-65, 80 L. Ed. 2d at 693-95). The burden of proving both prongs lies on Goff, who is faced with a rebuttable presumption that trial counsel is competent and his performance was not deficient. *Chase v. State,* 699 So. 2d 521, 526 (Miss. 1997). Additionally, Goff must show that there is a reasonable probability that, but for the errors of his counsel, the judgment would have been different. *Fisher v. State,* 532 So. 2d 992, 997 (Miss. 1988). Finally, this Court must determine whether trial counsel's performance was both deficient and prejudicial to the defense based upon the "totality of the circumstances." *Carr v. State,* 873 So. 2d 991, 1003 (Miss. 2004) (citing *Carney v. State,* 525 So. 2d 776, 780 (Miss. 1988)). If this Court finds that a ineffective-assistance charge chiefly fails under the prejudicial prong, then we may proceed directly to this part of the test. *See Strickland,* 466 U.S. at 697 ("If it is easier to

45

dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

### A. Failure to timely investigate Goff's potential mental health claims and inaccurate information provided to the trial court

¶122. According to Goff, his trial counsel provided ineffective assistance when they failed to have him evaluated until after the time to assert an insanity defense had passed and by providing incorrect information to the trial court.

¶123. On January 25, 2005, Goff's attorneys filed a motion for a court-ordered mental examination of the defendant because of the horrific nature of the crime. At the conclusion of a hearing on April 7, 2005, where Goff testified, defense counsel made clear that he was withdrawing the previous request for a mental evaluation for the purposes of determining whether Goff was competent to stand trial; rather, the evaluation was requested only for mitigation purposes.

¶124. At a second pretrial hearing on April 25, 2005, counsel further explained that he was no longer requesting a mental evaluation for the defendant. Counsel stated that, between the filing of the motion for the mental evaluation on January 21, 2005, and the hearing on April 7, 2005, he "could find no independent background of Mr. Goff where he would have had any psychiatric care or psychologist care or any indication that he would not be competent to stand trial or that he was legally insane at the time of the offense."

¶125. We find that counsel was not deficient, in that he was intimately familiar with Goff, his family, and his background, he had conducted his own investigation, and after

46

consultation with Goff, he withdrew his request for a mental evaluation as originally filed and asked that an evaluation be conducted for purposes of securing mitigation evidence. Furthermore, even if it could be said that Goff's counsel was deficient based on the failure to investigate, Goff has failed to demonstrate that counsel's actions prejudiced him. Despite Goff's contentions, the record indicates that counsel used the results of the examination for the purpose he intended–as evidence of mitigating circumstances at the sentencing phase. As the jury did in fact consider such evidence, this assignment of error is without merit.

**B. Failure to voir dire jurors on effect of viewing crime scene photographs**

¶126. Goff contends that his attorney's performance was constitutionally deficient because the jury was not questioned regarding whether they would be prejudiced by the gruesome photographs during the sentencing phase. Goff cites to **Ross v. State**, 954 So. 2d 968 (Miss. 2007) in support of this argument. However, **Ross** does not reveal any such finding by this Court. In addition, during voir dire, Goff's counsel explicitly inquired as to whether the gruesome photographs would affect their decision at the culpability phase.

¶127. This claim is without merit.

**C. Failure to object to victim impact at voir dire, in opening statement, and in testimony at the culpability phase**

**D. Failure to object to prosecutor's improper questioning on voir dire, improper closing argument on juror "promise," and argument outside the record**

¶128. Both C and D were discussed in Issue IV, *supra*, wherein we determined that the references to which Goff complains were not improper; and that the prosecutor did not ask

47

for a promise to convict, nor did he ask that any evidence to be ignored. Therefore, both charges are without merit, as this Court will not find ineffective assistance where a defendant's underlying claim is without merit. *Ross*, 954 So. 2d at 1004.

### E. Failure to object to jury composition

¶129. Goff claims that counsel's failure to object to the composition of the venire, which Goff claims had a disproportionate number of potential jurors with close ties to law enforcement, led to the violation of Goff's right to a fair trial and an impartial jury.

¶130. Goff is correct that this Court has reversed a conviction where an inordinate number of jurors were found to have had close ties to law enforcement. *See Mhoon v. State*, 464 So. 2d 77 (Miss. 1985) (*superseded by statute on other grounds*, see *Bevill v. State,* 556 So. 2d 699, 713 (Miss. 1990)). In *Mhoon*, the majority was troubled that Mhoon's counsel would have had to use all of his peremptory challenges just to exclude all the persons who were either on the police force or closely connected with the police force. *Id*. at 80. Moreover, this Court found that, even if Mhoon's counsel had wanted to do this, he could not have done so, as one juror had not properly identified her connection to the police on voir dire. *Id*. *Mhoon,* therefore, determined that these circumstances, inter alia, created an unfair hardship for the defendant. *Id.* at 81.

¶131. However, the unique circumstances which resulted in that finding by this Court in *Mhoon*, are not present in the case before us. Here, the jury pool was comprised of a fifty-eight person special venire. After challenges for cause, the trial judge struck ten potential jurors. Therefore, the remaining pool was composed of forty-eight venire-persons. Eleven

of these forty-eight persons had some degree of connection to law enforcement, which ranged from direct to indirect.

¶132. Of the twelve jurors chosen to serve, two had connections to law enforcement: Tiffany Hudson (panel one, juror nine) and Charlotte Driskell (panel four, juror six). Hudson's mother is a correctional officer at the jail where Goff was being held, and Driskell's daughter-in-law's first cousin is a deputy.

¶133. As reiterated in *Mhoon*, "[t]his Court does not hold that a person engaged in law enforcement, or related by blood or marriage to one engaged in law enforcement, should be per se excluded from jury service." *Id.* at 82. The number of potential jurors, as well as actual jurors, in this matter with ties to law enforcement was neither unusual nor problematic.

¶134. Furthermore, "[c]omplaints concerning counsel's failure to . . . make certain objections fall within the ambit of trial strategy" and cannot give rise to an ineffective assistance claim. *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995) (citing *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984)). This Court also has held that "jury selection decisions plainly fall within the 'ambit of trial strategy.'" *Reynolds v. State*, 784 So. 2d 929, 934 (Miss. 2001). As such, we find counsel's decision not to object to the composition of the venire to be a strategic decision which this Court will not second-guess. *Stringer v. State*, 454 So. 2d at 477.

¶135. This claim is without merit.

F.      **Counsel erred in requesting sentencing instruction 5, D-1A.**

49

¶136. Goff charges that counsel failed to provide competent representation when he requested sentencing instruction D-1A, which provided:

> You are advised that just because these instructions have listed certain aggravating circumstances you are allowed to consider, does not mean that those or any other aggravating circumstances exist. It is for only you the jury to determine, beyond a reasonable doubt, which aggravating circumstances exist and the weight, if any, to give to any particular aggravating circumstance.

¶137. According to Goff, this instruction advised jurors that the listed aggravating circumstances were not the only aggravating circumstances they could consider.

¶138. We see no error, prejudicial or otherwise, in this instruction. Further, as the State points out, jury instructions are to be read together and taken as a whole, with no one instruction taken out of context. *Byrom v. State*, 863 So. 2d 836, 874 (Miss. 2003). The State adds that another jury instruction, sentencing instruction 1, correctly ordered the jurors to consider only the following elements of aggravation, as set forth in Mississippi Code Annotated Section 99-19-101 (Rev. 2007), in determining whether the death penalty should be imposed:

1.  Whether the defendant was previously convicted of a felony involving the use or threat of violence to the person;
2.  Whether the defendant knowingly created a great risk of death to many persons;
3.  Whether the capital offense was committed while the defendant was engaged in the commission of robbery;
4.  Whether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest;
5.  Whether the capital offense was especially heinous, atrocious or cruel.

50

You must unanimously find, beyond a reasonable doubt, that one or more of the *preceding aggravating circumstances exists* in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed . . . .

(Emphasis added.)

¶139. The jury's verdict for the death penalty enumerated only those aggravators listed by statute. See Miss. Code Ann. § 99-19-101 (Rev. 2007). This claim is without merit.

### G.     Mishandling of State's Witness

¶140. Goff claims that during the testimony of Dr. Stephen Hayne, counsel failed to object to clearly irrelevant and prejudicial testimony concerning the amount of pain suffered by Brandy. As Dr. Hayne was testifying at the culpability phase, such evidence had no relevance to the cause and manner of death, according to Goff.

¶141. This Court, has stated that "[d]iscussion of pain by a forensic pathologist is admissible." *Mitchell v. State*, 792 So. 2d 192, 215-16 (Miss. 2001); *McGowen v. State*, 859 So. 2d 320, 335 (Miss. 2003) (quoting *Holland II*, 705 So. 2d 307, 341(Miss. 1997)). *See also Whittington v. State*, 523 So. 2d 966, 976 (Miss. 1988) (allowing forensic testimony that a victim suffered a fatal heart attack as a result of trauma and stress induced by a beating and robbery). "[I]n Mississippi, a forensic pathologist may testify as to what produced [a victim's] injuries . . . and what trauma such an injury would produce." *McGowen,* 859 So. 2d at 335 (quoting *Holland II*, 705 So. 2d at 341).

¶142. Because this type of testimony is admissible at trial, Goff is unable to make the

51

requisite showing of deficient performance under *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064-65, 80 L. Ed. 2d at 693-95, and his claim is without merit.

¶143. Goff also claims that during cross-examination, his counsel went from allowing prejudicial testimony to eliciting such testimony. In particular, Goff claims that counsel, having failed to interview Dr. Hayne before he testified, elicited testimony that there was no evidence of old injuries to Brandy,[28] as well as testimony concerning the removal of organs from Brandy's body.

¶144. In support of his argument that these actions by counsel amounted to ineffective assistance of counsel, Goff relies on a case decided by the United States Court of Appeals for the Tenth Circuit, *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002). "Where an attorney accidentally brings out testimony that is damaging because he has failed to prepare, his conduct cannot be called a strategic choice: an event produced by the happenstance of counsel's uninformed and reckless cross-examination cannot be called a 'choice' at all." *Id*. at 1296; *see* *Strickland*, 466 U.S. at 691 (counsel's failure to investigate must be product of a reasonable decision that the particular investigation is unnecessary or it is deficient).

¶145. This Court has not adopted the rule espoused by the Tenth Circuit. Rather, this Court has gone only so far as to comment that a defense attorney's failure to interview a pathologist, while "not duty-bound to [so]," was "surprising." *Holland v. State*, 587 So. 2d 848, 867 (Miss. 1991).

---

[28] Goff's theory of the defense was that Brandy's husband, James, had abused her in the past and was likely the one who had caused her death.

52

¶146. While defense counsel's actions may have been deficient, Goff has failed to demonstrate that he was prejudiced as a result of the testimony elicited. This point of error is without merit.

**H. Counsel's cumulative performance was constitutionally ineffective.**

¶147. Goff finally contends that defense counsel's errors, even if insufficient to establish ineffective assistance standing alone, when considered cumulatively, are sufficient to undermine confidence in the verdict and require reversal. Having found each the above-mentioned arguments to be without merit, we find that Goff was provided constitutionally effective assistance of counsel at trial. This issue is without merit.

**VI. Refusal to Grant a Circumstantial Evidence (Two-Theory) Instruction**

¶148. Goff asserts that the trial court erred by refusing to grant a properly submitted circumstantial evidence (two-theory) instruction citing ***Parker v. State,*** 606 So. 2d 1132, 1140-41 (Miss. 1992). Goff contends that, because this was a purely circumstantial evidence case, he was entitled to the instruction, and the court's denial of the instruction resulted in the jury not being fully and fairly instructed on the law, thus mandating reversal.

¶149. Goff sought to invoke the so-called "two-theory" circumstantial evidence instruction by submitted instruction D-14, which reads:

> The Court instructs the jury that if there may be a fact or circumstance in this cause susceptible of two interpretations, one favorable and the other unfavorable to the Defendant, and when the jury has considered such fact or circumstance with all other evidence, there is a reasonable doubt as to the

53

correct interpretation, then you, the jury, must resolve such doubt in favor of the Defendant, and place upon such fact or circumstance the interpretation most favorable to the Defendant.

¶150. The trial court refused the instruction on the basis that Goff was not entitled to both it and the typical circumstantial-evidence instruction (to the exclusion of every reasonable hypothesis consistent with innocence), and because the necessary burden of proof was included in the elements instruction.

¶151. This Court has held in matters where the case is based on "purely" circumstantial evidence, that the defendant is entitled to a two-theory instruction, as well as the general circumstantial-evidence instruction. *Parker,* 606 So. 2d at 1140-41 (quoting *Henderson v. State,* 453 So. 2d 708, 710 (Miss. 1984)). However, despite Goff's contention to the contrary, *Parker* is distinguishable from the case sub judice. As we explained, a circumstantial-evidence case (for the purposes of granting a "two-theory" instruction) is one in which there is neither an eyewitness nor a confession to the crime. *State v. Rogers,* 847 So. 2d 858, 863 (Miss. 2003) (citing *Mangum v. State*, 762 So. 2d 337, 344 (Miss. 2000)); *Stringfellow v. State,* 595 So. 2d 1320, 1322 (Miss. 1992); *see also Randolph v. State,* 852 So. 2d 547, 567 (Miss. 2002) (Carlson, J., concurring).

¶152. In Goff's statement to investigators, he admitted setting fire to the motel room. This constituted a confession to one of the crimes set forth in the indictment. Instruction D-14 sought to cover, in toto, all the evidence submitted in the State's case. Thus, based on *Rogers*, the trial court's decision to deny a "two-theory" instruction in this matter ultimately

was correct. *Rogers,* 847 So. 2d at 863. Therefore, this assignment of error is without merit.

¶153. Since its inception in Mississippi jurisprudence at the turn of the twentieth century in *Thompson v. State,* 83 Miss. 287, 35 So. 689 (1903), the "two-theory" circumstantial-evidence rule (in its different forms) has been condemned repeatedly by this Court, and for diverse reasons.[29] Six years after *Thompson*, we noted the problem behind this type of instruction:

> It rarely happens on the trial of a criminal case that two reasonable theories, one favorable to the state and the other favorable to the defendant, do not arise out of and to some extent find support in the evidence. If acted upon literally by juries, this instruction in most cases would amount to a peremptory instruction to find the defendant not guilty.

*Runnels v. State,* 96 Miss. 92, 96, 50 So. 499 (1909).[30] Yet, without either deciding the rule's legal validity, or denouncing *Thompson*, *supra*, *Runnels* simply held that when a

---

[29] The rule originated in the case of *Thompson v. State,* wherein the Court reversed a criminal conviction for the trial court's refusal to grant the following instruction:

> The court instructs the jury that if there is any fact or circumstance proven by the evidence in this case upon which the jury can place a reasonable construction favorable either to the state or the defendant, it is the duty of the jury to accept that construction favorable to the defendant, although the one favorable to the state is more reasonable.

83 Miss. at 287, 35 So. 2d. at 689.

[30] Although obiter dictum, since *Runnels* did not expressly denounce *Thompson*, the statement nonetheless espoused why our sister state Alabama already had expressly rejected the two-theory rule. *See*, e.g., *Gibson v. State*, 91 Ala. 64, 9 So. 171 (1890) (A charge which instructs the jury that, if the evidence is susceptible of two reasonable constructions, one of which is consistent with the defendant's innocence, it is their duty to adopt that construction, is calculated to confuse and mislead, and is properly refused.)

55

criminal defendant is given the necessary instructions that guilt must be proven beyond a reasonable doubt, refusal of this instruction will not constitute reversible error. *Id.*; *see also* (in chronological order) *Roux v. City of Gulfport,* 97 Miss. 559, 52 So. 485 (1910) (holding same, but reading *Runnels* as condemning the substance of the *Thompson* instruction); *cf. Saucier v. State,* 102 Miss. 647, 59 So. 858 (1912) (affirming, without comment, the trial court's refusal to allow the instruction in *Thompson* phraseology) (citing *Runnels* and *Roux*); *Wiley v. State,* 129 Miss. 196, 91 So. 906 (1922) (same) (citing *Runnels, Roux,* and *Saucier*); *Brady v. State,* 128 Miss. 575, 91 So. 277 (1922) (same) (citing same).

¶154.  Later, we expressly denounced *Thompson*, stating as follows:

> The principle sought to be invoked in this instruction was never applicable to testimony, except that of circumstantial evidence alone, and was improperly applied in *Thompson v. State,* 83 Miss. 287, 35 So. 689, to the testimony of eyewitnesses; and, as stated above, *has since been disapproved many times.* Its effect has been to mislead the jury and to prevent it from exercising its discretion in settling questions of veracity under proper instructions by the court.

*Fisher v. State,* 150 Miss. 206, 227-28, 116 So. 746, 750-51 (1928) (emphasis added)(citing *Runnels, Roux, Saucier, Wiley,* and *Brady*); *cf. Williams v. State,* 163 Miss. 475, 482, 142 So. 471, 472 (1932) (without commenting on *Thompson*, holding that our trial courts are not required to give a two-theory instruction when its substance is covered by other instructions).

¶155.  In *Micker v. State,* 168 Miss. 692, 152 So. 286 (1934), we expressly held the two-theory instruction as phrased in *Thompson* ("even though the hypothesis of guilt be the more probable") to be an *inaccurate statement of law* in any case. *Id.* at 698-99  (emphasis added).

We added that, even if correctly drawn, it would not be applicable where the conviction was based principally on eyewitness testimony. *Id.* (citing *Williams*, 163 Miss. 475, 142 So. 471). *See also Jones v. State,* 183 Miss. 408, 184 So. 810 (1938) (determining that the two-theory instruction, when correctly drawn, is not applicable to cases resting on direct testimony).

¶156. In *Yarborough v. State,* this Court opined that the two-theory instruction, whether correctly drawn or not, *should not be given in any case*. *Yarborough,* 202 Miss. 820, 830, 32 So. 2d 436, 440 (1947) (emphasis added). *Yarborough* reached this conclusion, first, because "there are always two theories, that of the State of guilt and that of the defendant of innocence, . . . the instruction, in effect, is a peremptory for the defendant." *Id.* Second, "it places upon the trial judge the burden and danger of saying the case is purely one of circumstantial evidence, whereas, in many cases, this is a very difficult question." *Id.* *Yarborough* nevertheless left the two-theory instruction (if drawn correctly) in place and affirmed the trial court's denial of the instruction on the basis that the case did not rest entirely upon circumstantial evidence and that the defendant had been granted the general circumstantial-evidence instruction, "to the exclusion of every reasonable hypothesis." *Id.*; *see also Lott v. State,* 204 Miss. 610, 37 So. 2d 782 (1948) (affirming the trial court's denial of a requested two-theory instruction in *Thompson* phraseology).

¶157. In *Simmons v. State*, 208 Miss. 523, 44 So. 2d 857, 858-59 (1950), we affirmed the trial court's denial of the two-theory instruction, on a finding that the case was not

circumstantial. Notably, ***Simmons*** construes ***Runnels***, as condemning a two-theory instruction, no matter how phrased. ***Id.***

¶158. Five years later, in ***Coward v. State,*** 223 Miss. 538, 78 So. 2d 605 (1955), we held that the refused two-theory instruction, identical to one proffered in the case sub judice, "is never proper except where the case rests entirely upon circumstantial evidence." ***Coward,*** 78 So. at 610.[31] ***Coward*** added, "even in a case based entirely on circumstantial evidence, if an instruction is allowed that the evidence must exclude every reasonable theory other than that of guilt, that is held to embody the essentials of the two-theory instruction, . . . refusal of the [two-theory instruction] is not reversible error." ***Id.*** (citing ***Yarborough***, 32 So. 2d at 440).

¶159. Then came ***Nester v. State,*** 254 Miss. 25, 179 So. 2d 565 (1965). In this case, we held that, because the evidence presented was so circumstantial, the two-theory instruction should have been granted along with the general circumstantial-evidence instruction, which had been given. ***Id.*** at 566 (emphasis added). ***Nester*** cited no case law for authority; rather the Court relied solely on Alexander, Mississippi Jury Instructions, (1953) Section 172, for its decision. ***Id.***

---

[31] The instruction was taken from Alexander, Mississippi Jury Instructions, (1953) Section 172, and phrased as follows:

> The court instructs the jury for the defendant, that if there be any fact or circumstances in this case susceptible of two interpretations, one favorable and the other unfavorable to the accused and when the jury have considered such fact or circumstances with all the other evidence, there is a reasonable doubt as to the correct interpretation, they must resolve such doubt in favor of the accused, and place upon such fact or circumstances the interpretation favorable to the accused.

¶160. In *Kitchens,* 300 So. 2d at 926, we affirmed the trial court's refusal to grant a two-theory instruction, both because the evidence was not entirely circumstantial and the general circumstantial-evidence instruction had been granted. Following in line with *Coward*, the *Kitchens* Court added, "even in a case based entirely on circumstantial evidence, if an instruction is allowed that the evidence must exclude every reasonable theory other than that of guilt, that is held to embody the essentials of the two-theory instruction, . . . refusal of the latter is not reversible error." *Id.* (quoting *Coward*, 78 So. 2d at 610).

¶161. Yet we changed course in *Henderson v. State,* 453 So. 2d 708 (Miss. 1984), and held the trial court in error for refusing to give both the general circumstantial-evidence instruction and the "two-theory" instruction. *Id.* at 710. Ignoring *Kitchens*, *Henderson* stated:

> Where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict. *Sanders v. State,* 286 So. 2d 825, 828 (Miss. 1973); *Matula v. State,* 220 So. 2d 833, 836 (Miss. 1969). Also where the evidence is purely circumstantial, the trial court must grant a "two-theory" instruction. *Johnson v. State,* 347 So. 2d 358, 360 (Miss. 1977); *Nester v. State,* 254 Miss. 25, 29, 179 So. 2d 565, 566 (1965).

*Id. Johnson*, cited by *Henderson* for authority, affirmed the trial court's decision denying the requested two-theory instruction both because the requested instruction did not contain the language "reasonable doubt" and the case was not entirely circumstantial. *Johnson*, 347 So. 2d at 360. *Johnson*, in addressing the appellant's argument, merely opined that "[t]he two-theory instruction may be given only in an entirely circumstantial evidence case." *Id.*

59

¶162. We hold today that ***Kitchens*** provides the better rule: "In a case based entirely on circumstantial evidence, if an instruction is allowed that the evidence must exclude every reasonable theory other than that of guilt, that is held to embody the essentials of the two-theory instruction, . . . refusal of the latter is not reversible error." ***Kitchens***, 300 So. 2d at 926 (quoting ***Coward v. State***, 223 Miss. 538, 78 So. 2d 605 (1955)). To the extent that ***Parker***, ***Henderson***, and other cases suggest otherwise, they are hereby overruled.

### VII. Instruction Embodying the Theory of Defense

¶163. Our standard for review for the denial of jury instructions is as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

***Chandler v. State***, 946 So. 2d 355, 360 (Miss. 2006) (quoting ***Ladnier v. State***, 878 So. 2d 926, 931 (Miss. 2004)).

¶164. Goff contends that the trial court, by refusing his submitted instruction D-16, denied him the only opportunity he had for the jury to consider his theory of defense. Goff's theory of defense is that Brandy's husband, James, not Goff, killed Brandy. In support of this contention, Goff points to his own statement to police, admitted as Exhibit 70, that it must have been Brandy's husband that killed her. Goff also points to James's alleged history of domestic violence and the testimony of Detective Lambert.

60

¶165. Submitted instruction D-16 provides:

I charge you, members of the jury, that one charged with a crime is permitted to introduce evidence, in exoneration of himself, which if believed by the jury will tend to show that some other person committed the offense charged. In order to justify an acquittal, the totality of any evidence offered to show the guilt of another need not be of such strength as to warrant a finding by the jury that such other did, in fact, commit the crime charged. If the jury believes there is evidence which reasonably tends to show that some other person committed the crime charged, and this evidence, when considered with all the other evidence in the case, generates a reasonable doubt in the minds of the jury as to whether the Defendant is the perpetrator of the criminal act, the Defendant must be acquitted.

¶166. The trial court denied the instruction, stating, "I believe it's improper comment by the Court upon the weight of the evidence. That will be refused."

¶167. We find that the trial court did not err in denying instruction D-16 for the following two reasons: (1) the instruction is without foundation in the evidence, and (2) the instruction is covered fairly elsewhere in the instructions.

¶168. In addition to his own statement to police that James must have been the one who killed Brandy, Goff offers that James, during his testimony, admitted to a past domestic incident involving Brandy. James's testimony on cross-examination was as follows:

BY COUNSEL FOR GOFF (DEEN): You said you were having marital problems. Right?
BY JAMES: Correct.
BY COUNSEL FOR GOFF (DEEN): And that you were on again, off again with her. Is that right?
BY JAMES: We had split up one time before. This would be the second time.
BY COUNSEL FOR GOFF (DEEN): Was it in 2004 you had split up?

61

BY JAMES:  I would say 2003.

BY COUNSEL FOR GOFF (DEEN):  Was that over domestic violence that ya'll split up?

BY JAMES:  No, sir.

BY COUNSEL FOR GOFF (DEEN):  It had nothing to do with that?

BY JAMES:  No, sir.

BY COUNSEL FOR GOFF (DEEN):  Was that ever a problem in your household?

BY JAMES:  Direct problem, no.

BY COUNSEL FOR GOFF (DEEN):  Sir?

BY JAMES:  Direct problem, no.

BY COUNSEL FOR GOFF (DEEN):  A direct problem.  But there was a problem with fights and stuff with ya'll, wasn't there?

BY JAMES:  There was disagreements and arguments, yeah.

BY COUNSEL FOR GOFF (DEEN):  Physical fights.

BY JAMES:  Physical fighting, no.

BY COUNSEL FOR GOFF (DEEN):  The law never was called to your house?

BY JAMES:  One time.

BY COUNSEL FOR GOFF (DEEN): How close was that to when, to August of 2004 that the law was called to your house because of fighting going on there.

BY JAMES:  Three or four years ago.

¶169.  The record also shows that the jury heard evidence that the investigators reviewed James's phone records, which corroborated his whereabouts at the time of Brandy's murder, and took photographs of his body, prior to excluding him as a suspect in the matter.  In sum, Goff failed to establish a sufficient evidentiary foundation to warrant this instruction.

¶170.  Further, the jury also was properly instructed elsewhere in the instructions, when it

was told that it could convict Goff of capital murder only if the State proved, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, each and every element of the crime. This was set out in instruction S-2A, which provided:

> The Defendant, Joseph Bishop Goff, has been charged in the indictment with the crime of Count I: Capital Murder for having killed Brandy S. Yates during the commission of the felony crime of Robbery of Brandy S. Yates.

> If you find from the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence:

> (1) Joseph Bishop Goff, on or about August 27, 2004, in George County, Mississippi;

> (2) did willfully, unlawfully, feloniously and without authority of law and not in necessary self-defense;

> (3) with or without any design to effect the death, kill and murder Brandy S. Yates, a human being;

> (4) at a time when Joseph Bishop Goff was engaged in the commission of the felony crime of Robbery, by taking the personal property of Brandy S. Yates in her presence or from her person against her will by violence to the person of Brandy S. Yates; then you shall find the Defendant, Joseph Bishop Goff guilty of Capital Murder.

> If the State has failed to prove any one or more of the above elements beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, then you shall find the Defendant, Joseph Bishop Goff not guilty of Capital Murder.

¶171. For the foregoing reasons, we hold that this assignment of error is without merit.

**VIII.   Whether the Indictment Charged a Death-Penalty Eligible Offense.**

¶172. Count I of the indictment, which charges Goff with capital murder pursuant to

63

Mississippi Code Section 97-3-19(2)(e), that Goff:

> In George County, Mississippi, on or about August 27, 2004, did then and there willfully, unlawfully, and feloniously, and with or without any design to effect the death, kill and murder Brandy S. Yates, a human being, while in the commission of the crime and felony of Robbery, as defined by Section 97-3-73, Miss. Code of 1972, as amended.

¶173. Goff argues that his death sentence must be vacated because the indictment failed to include a statutory aggravating factor or the *mens rea* standard required for capital murder. In support of this argument, Goff cites *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

¶174. This Court repeatedly has rejected this type of argument. *See, e.g.*, *Spicer*, 921 So. 2d at 319; *Brown v. State*, 890 So. 2d 901, 918 (Miss. 2004); *Stevens v. State*, 867 So. 2d 219, 225-27 (Miss. 2003). We have held that *Apprendi* and *Ring* address issues wholly distinct from the present one, and in fact do not address indictments at all. *Spicer*, 921 So. 2d at 319 (citing *Brown*, 890 So. 2d at 918).

¶175. The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense. *Spicer*, 921 So. 2d at 319 (citing *Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984)). An indictment is required only to have a clear and concise statement of the elements of the crime with which the defendant is charged. *Id*.

¶176. Under Mississippi law, the underlying felony that elevates the crime to capital murder

must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged. *Bennett v. State*, 933 So. 2d 930, 952 (Miss. 2006) (citing Miss. Code Ann. § 99-17-20)). In addition, "[o]ur death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment." *Spicer*, 921 So. 2d at 319 (quoting *Brown*, 890 So. 2d at 918).

¶177. When Goff was charged with capital murder, he was put on notice that the death penalty might result, what aggravating factors might be used, and the *mens rea* standard that was required. *See Stevens*, 867 So. 2d at 227. This assertion of error is without merit.

### IX. Lethal Injection Protocol

¶178. Goff asserts that execution by lethal injection, under the current Mississippi protocol, would violate the First and Eighth Amendments of the United States Constitution, corresponding provisions of the Mississippi Constitution, and state law.

¶179. Goff's claim that Mississippi's method of inflicting death by lethal injection constitutes cruel and unusual punishment was dispositively rejected in favor of the State by the United States Supreme Court's holding in *Baze v. Rees* and by this Court's holding in *Bennett v. State*. In *Bennett*, this Court stated:

> On April 16, 2008, the United States Supreme Court decided *Baze v. Rees*, upholding the State of Kentucky's lethal-injection protocol as not being vocative of the Eighth Amendment. *Base v. Rees*, 553 U.S. , 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). In so doing, Chief Justice Roberts's plurality opinion announced the standard which we must use to determine whether our method of execution violates the Eighth Amendment. *Id*. The Supreme Court's plurality found that cruel and unusual punishment occurs where lethal injection

65

as an execution method presents a "substantial" or "objectively intolerable risk of serious harm" in light of "feasible, readily implemented" alternative procedures. *Id*. at 1531, 1532. However, the analysis was focused on the manner of lethal injection, and did not question the validity of lethal injection or the constitutionality of the death penalty as such. *Id*. at 1537. The ***Base*** Court held:  Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States . . . [which] if administered as intended . . . will result in a painless death. The risks of maladministration . . . such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel - cannot be remotely characterized as "objectively intolerable."  Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment. ***Base***, 128 S. Ct. at 1537.

For "the disposition of other cases uncertain," Justice Roberts clearly stated that "[a] State with a lethal injection protocol *substantially similar* to the protocol we uphold today would not create a risk that meets [the 'substantial risk'] standard." *Id*. at 1537 (emphasis added).

If differences exist between Mississippi's execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi's lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop's Eighth-Amendment challenge to Mississippi's lethal-injection procedures, recently announced that "Mississippi's lethal injection protocol appears to be substantially similar to Kentucky's protocol that was examined in Base." ***Walker v. Epps***, 2008 U.S. App. LEXIS 15547 at [*13] (5th Cir. Miss. July 21, 2008). We agree with the Fifth Circuit's analysis, and hold that Bennett's Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.

***Bennett v. State***, 990 So. 2d at 160-61.

¶180.   We find no merit in Goff's Eighth-Amendment argument.

¶181.   Goff's First-Amendment claim is procedurally barred, as Goff offers no discussion

and cites no authority in support of this claim.  *See **Byrom***, 863 So. 2d at 891 (appellants

alleging errors must present us with a complete record highlighting the alleged errors supported by citation to relevant case law); ***Randolph***, 852 So. 2d at 558 (in the absence of meaningful argument and citation of authority this Court will generally not consider the assignment of error).

¶182. Procedural bar notwithstanding, for reasons articulated in ***Spicer,*** 973 So. 2d at 207-08, Goff's First-Amendment claim is wholly without merit.

### X. Aggravating Factors

¶183. At the conclusion of the sentencing phase, the jury found that the following aggravating circumstances existed: (1) Goff previously was convicted of a felony involving the use or threat of violence to the person; (2) Goff knowingly created a great risk of death to many persons; (3) the capital offense was committed while Goff was engaged in the commission of a robbery; (4) the capital offense was committed for the purpose of avoiding or preventing lawful arrest; and (5) the capital offense was especially heinous, atrocious, and cruel. *See* Miss. Code Ann. § 99-19-101(5) (Rev. 2007).

¶184. Goff alleges that error was committed when certain aggravating factors were submitted to the jury. In particular, Goff asserts that there was insufficient evidence to support three of the aggravating factors: that the killing took place while in the commission of a robbery, that Goff knowingly created a great risk of death to many persons, and that the killing was committed for the purpose of avoiding or preventing his arrest. While Goff does not challenge the submission of the aggravating factor that the capital offense was especially

67

heinous, atrocious, or cruel, he does challenge the constitutionality of the "heinous, atrocious, or cruel" limiting instruction given.

¶185. Mississippi Code Section 99-19-105(3)(b) states that this Court must consider the sufficiency of the evidence to support the aggravating circumstances. *See Simmons v. State*, 805 So. 2d 452, 495-96 (Miss. 2001).

### A. Previously convicted of a felony involving the use or threat of violence to the person

¶186. The State presented evidence that Goff had previously been convicted of second-degree assault and discharge of a gun in an occupied building and vehicle, which Goff does not the challenge.

### B. Killing in the commission of a robbery

¶187. Goff contends that the evidence was insufficient to support the robbery aggravator. This issue is without merit for the reasons discussed in Issue III, *supra*.

### C. Knowingly creating a great risk of death to many persons

¶188. We find that it was proper for the jury to consider whether Goff knowingly created a great risk of death to many persons. "Use of this aggravating circumstance is not limited to those crimes where very large numbers of individuals are at risk or those where the safety of others than the intended few was jeopardized." *Simmons*, 805 So. 2d at 495 (citing *Jackson v. State*, 684 So. 2d 1213, 1235 (Miss. 1996)). Goff admitted to deliberately setting fire to Room 121, and the testimony at trial showed that, in addition to the desk clerk on duty,

and at least one other guest was staying at the Rocky Creek Inn on the night in question.

¶189. Goff cites *Meeks v. State*, 604 So. 2d 748, 752 (Miss. 1992), for the proposition that the State erroneously used the evidence of arson to support the aggravating circumstances although he was separately convicted and sentenced for the crime of arson. In other words, Goff contends that the State cannot use this evidence a second time to support the aggravating circumstances. However, *Meeks* is distinguishable from the facts before this Court today.

¶190. In *Meeks*, the defendant was indicted in Count I and convicted for capital murder with the underlying felony of kidnapping and separately indicted in Count II and convicted for kidnapping. *Meeks*, 604 So. 2d at 751. Meeks was sentenced to life imprisonment for capital murder and separately sentenced to thirty years for the kidnapping. *Id*. at 750. The record indicated that the only person kidnapped was Meeks's wife, Tana. *Id*. at 750 n. 1. This Court held that Meeks could not be placed in jeopardy twice, first for the penalty of death for capital murder with the underlying felony of kidnapping and a second for the punishment of kidnapping as a separate offense. *Id*. at 753. The fact that Meeks ultimately received a life sentence, instead of the death penalty, for the capital murder, and a thirty-year sentence for the kidnapping was of no moment, as the double-jeopardy issue still remained. *Id*.

¶191. Here, Goff was indicted in Court I on capital murder with the underlying felony of robbery and separately indicted in Count II on arson. Unlike *Meeks*, Goff was never indicted

69

or convicted for a separate offense that was also the basis of the underlying felony supporting and elevating a murder to capital murder.

**D.      Killing committed for the purpose of avoiding or preventing arrest**

¶192. This Court has stated the standard for reviewing the sufficiency of the evidence to support an "avoiding-lawful-arrest" instruction:

> [I]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killings to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.
>
> Under this construction the Court properly submits this aggravator to the jury if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.

*Mitchell*, 792 So. 2d at 219 (quoting *Manning v. State*, 735 So. 2d 323, 350 (Miss. 1999)).

¶193. We find that it was proper for the trial court to allow the jury to consider this aggravating factor.  Goff, by his own admission, removed all items from the motel room which be believed might contain his fingerprints and which might tie him to the crime.  Goff also admitted that he set fire to the motel room to avoid detection of this crime.  Goff's contention as to *Meeks* was discussed in Section B., *supra*.

¶194.   Therefore, this issue is without merit.

**E.      Heinous, atrocious, and cruel limiting instruction**

70

¶195. Goff argues that the limiting instruction given was unconstitutionally vague. The jury was charged in sentencing instruction S-12 as follows:

> The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious, or cruel: heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders—the conscienceless or pitiless crime which is unnecessarily tortuous [sic] to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim then you may find this aggravating circumstance.

¶196. The exact language of this instruction has been found to be legally sufficient so as to satisfy constitutional requirements in previous decisions by this Court. *See Bennett*, 933 So. 2d at 955-56; *Havard v. State,* 928 So. 2d 771, 799-800 (Miss. 2006); *Knox*, 805 So. 2d at 533; *Stevens v. State*, 806 So. 2d 1031, 1060 (Miss. 2001).

¶197. In *Stevens,* we held that the "'especially heinous, atrocious or cruel' provision of Miss. Code Ann. § 99-19-101 (5)(h) is not so vague and overbroad as to violate the United States Constitution." *Stevens,* 806 So. 2d at 1060.

¶198. The trial court's decision to grant this instruction was in accordance with established precedent and was not error.

## XI.    Proportionality of Off's sentence

¶199.  This Court is required by statute to perform a proportionality review when reviewing the imposition of a death sentence.  Mississippi Code Section 99-19-105(3) states:

> (3) With regard to the sentence, the court shall determine:
>
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
>
> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
>
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant
>  . . . .

Miss. Code Ann. § 99-19-105(3) (Rev. 2007).

¶200.  After reviewing the record in this appeal as well as the death penalty cases listed in the appendix, we find Goff's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.[32]  *See* Miss. Code Ann. § 99-19-105(3)(a).

¶201.  We further find that, as discussed in issue X, *supra*, the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances. *See* Mississippi Code Annotated § 99-19-105(3)(b)(Rev. 2007).

¶202.  With regard to Mississippi Code Section 99-19-105(3)(c), Goff claims that it is clear that his death sentence is both excessive and disproportionate to the penalty imposed in other capital cases.  According to Goff, because of the gravity of his mental disabilities, his

---

[32]  Goff presents no evidence that his sentence was imposed under the influence of passion or prejudice or any other arbitrary factor.

72

sentence should be vacated, and the case should be remanded for modification of the sentence to life imprisonment pursuant to Mississippi Code Section 99-19-105(5)(c).

¶203. Goff claims that the "record is replete with evidence which demonstrates the degree to which Goff is impaired mentally" and that the "record demonstrates that he has been diagnosed with bipolar disorder with psychotic features." In particular, Goff references his bizarre behavior at trial and his inappropriate laughter during questioning by police, as well as the testimony of both Dr. Van Rosen and Lessie Goff during sentencing that Goff was suffering from the disorder the night Brandy was killed.

¶204. During the sentencing phase of trial, Dr. Rosen stated that he had interviewed Goff twice, and he explained the tests which were used in evaluation of Goff.[33] Dr. Rosen testified that Goff had a full scale IQ score of 102, which is in the average-to-slightly-above average range. Dr. Rosen believed that Goff "was trying very hard to convince [him] that he did not have a mental disorder" and that the results of the testing reveal that Goff does not want to be seen as mentally ill. The testing further indicated to Dr. Rosen that Goff has a "terrifically bad self-image," that Goff has "periods of high energy, even excitement," and that Goff has a "strong tendency towards substance abuse." The results of the inkblot test suggested to Dr. Rosen that Goff "is a gentleman who has periods of significant depression" and "pointed to probably a bipolar disorder." Based on his interviews with Goff, Dr. Rosen gave Goff the

---

[33] The following tests were administered to Goff: the Wexler Adult Intelligence Scale, Third Edition; the Minnesota Multi-Phasic Personality Inventory, Version 2; the Mayung Multi-Axial Clinical Inventory, Version 3; and the Rorschach inkblot method.

73

diagnosis of "personality disorder with prominent antisocial and schizotypal traits, coupled with bipolar disorder with occasional psychotic features." With regard to Goff's condition on the night of Brandy's murder, Dr. Rosen believed that Goff "was in the midst of a bipolar disorder psychotic episode."

¶205. We find, however, that Goff has submitted no proof of any mental defect of any degree, with the exception of Dr. Rosen's testimony, and this testimony is admittedly based on Goff's unverified self-reporting of past problems. While testifying, Dr. Rosen stated that Goff was not "terrifically cooperative," that Goff would not allow him access to his past psychiatric records, and that Goff provided only vague information in response to questions. In fact, Dr. Rosen stated that Goff's history was incomplete, and thus the diagnosis given was not as firm as it could have been under normal circumstances.

¶206. In addition, after comparing the facts of this instant case with factually similar cases in which the death sentence was imposed, we conclude that the sentence of death was neither excessive nor disproportionate.

¶207. This Court has upheld the death penalty in cases involving capital murders during the commission of a robbery. In *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1996), this Court found that both the conviction and the sentence were appropriate. In *Doss*, during the course of a robbery of a grocery store, a store clerk was shot and killed. *Id*. This Court has found that the sentence of death was proportionate where the defendant had strangled and robbed the victim. *Cabello v. State*, 471 So. 2d 332 (Miss. 1985). *Cabello* observed that "this Court

74

has recently affirmed several convictions and death sentences where the defendant was found guilty of robbery/murder . . . ." *Id*. at 350 (citing *Dufour v. State*, 453 So. 2d 337 (Miss. 1984); *Stringer v. State*, 454 So. 2d 468 (Miss. 1984); *Booker v. State*, 449 So. 2d 209 (Miss. 1984). In *Evans v. State*, 422 So. 2d 737, 747 (Miss. 1982), as in *Doss*, this Court held that the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the manner in which it was committed as well as the defendant. Like the defendant in *Doss*, the defendant in *Evans* had shot a store clerk during the course of a store robbery.

¶208. This Court also has upheld the use of the death penalty in cases in which the defendant claimed to have mental problems. In *Berry v. State*, 703 So. 2d 269, 293-94 (Miss. 1997), this Court found that Berry's death sentence was not excessive or disproportionate in relation to other cases, despite the fact that Berry was a paranoid schizophrenic functioning with brain damage and an impaired intellectual capacity. Goff, like the defendant in *Berry*, cites this Court's decision in *Edwards v. State*, wherein this Court found the death penalty disproportionate because the defendant suffered from paranoid schizophrenia. *Id*. at 293 (citing *Edwards v. State*, 441 So. 2d 84, 93 (Miss. 1983)). The following discussion found in *Berry* is instructive:

> Indeed, we recently held that a diagnosis of paranoid schizophrenia does not necessarily prohibit the imposition of the death penalty where the defendant is competent to be executed. See *Billiot v. State*, 655 So. 2d 1, 17 (Miss. 1995), cert. denied, 516 U.S. 1095, 133 L. Ed. 2d 762, 116 S. Ct. 818 (1996). Expert testimony at Berry's trial revealed that he is indeed competent to be executed. See *Lowenfield v. Butler*, 843 F.2d 183, 187 (5th Cir. 1988), cert. denied, 485

75

U.S. 1014, 99 L. Ed. 2d 714, 108 S. Ct. 1487 (1988) (stating that for one to be competent to be executed he has to be aware of the punishment he is about to suffer and why he must suffer it).

*Edward*s is also distinguishable because the evidence of Edwards' affliction, unlike that in Berry's case, was "overwhelming, if indeed not without contradiction . . . ." *Edwards*, 441 So. 2d at 93. Edwards had been committed to the Mississippi State Hospital at Whitfield on two occasions and had a long history of hallucinations in which people were out to "get" or kill him. *Id*. at 87-88. Physicians had treated Edwards' condition for years with the drugs prolixin, cogentin, valium, and stelazine. *Id*. at 87. There is no evidence, on the other hand, that Berry had ever been diagnosed and/or treated, much less institutionalized, for his various afflictions prior to his killing Mary Bounds. There is also no evidence of Berry ever having suffered from any hallucinations.

Berry's I.Q. of 76 and his frontal lobe impairment afford him no relief either. According to Dr. Blanton, an I.Q. of 76 is in the borderline range of intellectual function and does not render one mentally retarded. In *Lanier v. State*, 533 So. 2d 473, 492 (Miss. 1988), the defendant had an I.Q. of 61 and suffered from hallucinations, yet we held that such disorders were not on the same level as those found in the *Edwards* case. The defendant, in *Neal v. State*, 451 So. 2d 743, 752 (Miss. 1984), cert. denied, 469 U.S. 1098, 83 L. Ed. 2d 716, 105 S. Ct. 607 (1984), post-conviction relief granted in part on other grounds, 525 So. 2d 1279 (Miss. 1987), had an I.Q. of 54 and suffered from the organic brain disorder dementia. This disease, which according to Dr. Blanton, is quite similar to Berry's frontal lobe impairment, affects a person's memory and ability to control his impulses. *Id*. Despite that fact, we held that Neal's disturbances were not on par with those in *Edward*s. 451 So. 2d at 762.

It appears then that Berry's mental state is more comparable to that of the defendants in *Lanier* and *Neal* than that of Hezekiah Edwards. As such, Berry's death sentence is not excessive or disproportionate in relation to other cases, and we reject this claim.

*Berry*, 703 So. 2d at 293-94.  Goff has an full scale IQ score of 104, which, according to Dr.

Rosen, places him the average-to-slightly-above-average range.  Also, as noted above, Goff

refused to allow Dr. Rosen access to his past psychiatric records and refused to effectively

participate in Dr. Rosen's evaluation, thus making Dr. Rosen's diagnosis less than reliable. In light of the foregoing, we find that the death sentence imposed in this case is neither excessive nor disproportionate.

### XII. Cumulative Error

¶209. Goff submits that, should this Court not find any one error sufficient to warrant reversal of the death sentence in this case, the accumulation of such errors should be taken into consideration and the sentence reversed because of cumulative error.

¶210. This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that independently would not require reversal. *Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992); *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991). "It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." *Woodward v. State*, 533 So. 2d 418, 432 (Miss. 1988), *cert. denied*, 490 U.S. 1028, 109 S. Ct. 1767 , 104 L. Ed. 2d 202 (1989).

¶211. After conducting a thorough review of the record, the briefs, and the argument, this Court has determined that there are no individual errors, or cumulative near errors, which require reversal of either Goff's conviction or his sentence.

### CONCLUSION

¶212. Goff's convictions and death sentence were properly decided by the jury. Based on the foregoing analysis, we affirm both the convictions and the sentences.

77

¶213. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II: CONVICTION OF ARSON (SECOND DEGREE) AND THE SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCE IN COUNT II IS TO RUN CONSECUTIVE TO THE SENTENCE IN COUNT I.**

**CARLSON, P.J., DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., DICKINSON, LAMAR AND PIERCE, JJ. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.**

**DICKINSON, JUSTICE, SPECIALLY CONCURRING:**

¶214. Although I concur with the majority opinion, I write separately to address Goff's argument that the evidence was insufficient to establish the underlying felony of robbery. In essence, the only proof of robbery in this case is that Goff was discovered soon after the murder with the victim's property. This Court has long and consistently held that no more than this single piece of circumstantial evidence is needed to create a jury question as to the robbery.

¶215. In *Wheat v. State*, 420 So. 2d 229 (Miss. 1982), Joseph Mayer and Teresa Hayes married and traveled to the Mississippi Coast for their honeymoon. *Id.* at 230. After a phone conversation with Mayer's father, they were not seen or heard from again until their bodies were found in a wooded area north of Gulfport. *Id.* at 231. Their hands and feet were tied behind them, and each was shot in the back of the head. *Id*.

78

¶216. After it was reported that the Mayers had been driving a 1976 Cutlass with a Kentucky license plate, four witnesses came forward and stated that a man had come to their house and asked for assistance getting a car of that description out of a ditch. *Id.* From the witnesses' descriptions a composite sketch was made and circulated. *Id.* Kenneth Wheat was arrested and indicted by a Harrison County grand jury for capital murder, with the underlying crime of robbery. *Id.* The jury found him guilty and sentenced him to death.

¶217. Wheat appealed, claiming, inter alia, that he should not receive the death penalty because there was no proof of the crime of robbery in connection with the alleged murder. *Id.* at 238. This Court affirmed Wheat's conviction, stating:

> At approximately 9:30 p.m. on the night Joseph Mayer[34] was killed, he was at the Worth Motel on the beach 26 miles from where he was killed that same night. The jury found that appellant killed him. Approximately two and one-half hours after the young couple were together at the motel, appellant appeared at the Netto home with the Mayer car which place was approximately 1.4 miles from where Mayer was killed. Appellant was in complete possession of the Mayer car, along with its contents, consisting of a leather case, luggage, books, camera, radio, baseball bat, and maps.
>
> ****
>
> Fully considering the history of all that occurred on the night in question, the condition of Mayer's body with his hands and feet tied, and a bullet hole through the back of his head and shortly thereafter appellant being solely in full possession of the Mayer vehicle and its contents, is clearly a question for the jury as to whether or not he "robbed" Mayer of his car. There certainly is no other reason shown in this record for the brutal murder of young Mayer.

---

[34]Wheat was tried separately for the murder of the couple. He was convicted of the wife's murder, but the jury could not agree on a punishment. This trial was for the murder of the husband.

*Id.* at 238-39.

¶218. In *Billiot v. State*, 454 So. 2d 445 (Miss. 1984), Wallace Croll, Jr., his wife and daughter were found bludgeoned to death in their home. *Id.* at 451. The bodies were found by 12-year-old Stephen Croll and some of his friends, after they saw defendant James Billiot driving Wallace Croll's car and became suspicious. *Id.* When the bodies were found, an all-points bulletin was issued in Mississippi and Louisiana, and two days later Billiot was arrested. *Id.* He was tried and convicted of capital murder and sentenced to death.

¶219. Billiot appealed, claiming, inter alia, that the verdict was against the overwhelming weight of the evidence because the State failed to prove the underlying felony of robbery. *Id.* at 462-63. This Court affirmed Billiot's conviction, stating:

> Billiot was seen driving away from the scene in the car owned by the deceased Croll. Billiot also admitted he took $60.00 from Wallace Croll's wallet. The issue of intent was a question of fact for the jury. Having been properly instructed on the elements of robbery and capital murder, taking the evidence as a whole, it was reasonable for the jury to conclude that Billiot committed the murder while engaged in the crime of robbery.

*Id.* at 463.

¶220. In *Fisher v. State*, 481 So. 2d 203 (Miss. 1985), Melinda Weathers was reported missing when she failed to return home from a softball game. Her car was later found abandoned along Highway 11/80 outside of Meridian. *Id.* at 206. Four days later, her naked body was discovered by a search party on an old logging trail outside of Meridian. *Id.* After the discovery of Melinda's body, law enforcement authorities theorized that the suspect

80

might be the same individual that had stopped and raped another female near that area. *Id.* Authorities organized a decoy operation designed to attract a suspect whose mode of operation was to stop lone female drivers along Highway 11/80. *Id.* at 207.

¶221. A month after Melinda's body was found, the decoy was driving along Highway 11/80 when a pickup truck approached her car from behind and flashed its lights. *Id.* When the driver of the pickup approached the car, a detective who was hiding in the backseat jumped out and arrested the man, defendant Larry Fisher. *Id.* After Fisher's arrest, a gold pendant and the back of an earring were discovered in his truck. *Id.* Melinda's mother identified the gold pendant as Melinda's. *Id.* at 207-08.

¶222. Fisher was subsequently charged with the capital murder of Melinda Gail Weathers while he was engaged in the crimes of rape *and* robbery. *Id.* at 210. After a trial, the jury found him guilty of capital murder and sentenced him to death. *Id.* at 211. Fisher appealed, claiming, inter alia, that the State's evidence was legally insufficient to establish certain elements of the crime of capital murder, particularly the underlying felonies of rape and robbery. *Id.*

¶223. Although this Court reversed and remanded the case for a new trial in a different venue, this Court stated that the evidence of robbery was sufficient for a conviction:

> There is evidence that Fisher took from Melinda Gail Weathers several pieces of jewelry, personal property having some value, although modest. The same evidence mentioned above [speaking of evidence of the rape] would enable any reasonable juror to conclude beyond a reasonable doubt that this taking was by violence to her person or by putting her in fear of immediate personal

81

injury. Fisher's felonious intent is similarly shown by that which the established facts and circumstances show that he did. ***Wheat v. State***, 420 So.2d 229, 238-39 (Miss.1982); ***Voyles v. State***, 362 So.2d 1236, 1242-43 (Miss.1978). We hold that the evidence in this case was legally adequate to establish that Larry Fisher committed the underlying felony of robbery of Melinda Gail Weathers.

481 So. 2d at 214.

¶224. In ***Duplantis v. State***, 708 So. 2d 1327 (Miss. 1998), Gary Thrash went to his ex-wife's house to check on her after he heard that two prisoners had escaped. ***Id.*** at 1333. His body later found lying in a pool of his own blood on his ex-wife's kitchen floor. ***Id.*** His pockets were empty, and his truck was missing. ***Id.*** Thrash's truck was subsequently found abandoned in Memphis, Tennessee. ***Id.***

¶225. After investigating two phone calls made from the residence where the murder had taken place, the police arrested Ken Strickland and David Duplantis in Jackson, Tennessee. ***Id.*** at 1334. Duplantis was indicted, tried and convicted for the capital murder of Gary Thrash and sentenced to life in prison without parole.[35] ***Id.*** at 1331. He appealed, claiming, inter alia, that he did not possess the intent to rob the victim until after the killing, and thus the killing could not have been done in the course of the robbery. ***Id.*** at 1341. This Court affirmed his conviction, stating:

> In the case sub judice, Duplantis was an escapee from jail. He had no money, nor did he have access to it. It is not beyond the realm of inference to believe that Duplantis first developed the intent to rob Gary Thrash of his truck and money, and then killed Mr. Thrash when he did not cooperate. The jury

---

[35]This was Duplantis's second trial. His first trial, which resulted in a death sentence, was overturned by this Court on grounds not related to the underlying robbery.

apparently drew this inference, or one similar thereto, from the facts. We accept the jury's finding. Furthermore, the possibility that the precise moment of Thrash's death may have preceded the actual consummation of the robbery does not vitiate the capital charge. This assignment of error is without merit.

*Id.* at 1342.

¶226. In *Knox v. State*, 805 So. 2d 527 (Miss. 2002), while responding to a missing person report, authorities found the victim dead in the trunk of her car in her carport. *Id.* at 529. After discovering the body, the sheriff left the scene to interview people in the community to "develop a suspect." *Id.* at 529-30. An informant told him that Steve Knox was involved in the victim's death. *Id.* at 530. Authorities began searching for Knox based on the description given to them by the informant. *Id*.

¶227. Officers found Knox walking in a field close by. *Id.* The officers questioned Knox about the victim, and Knox denied knowing her. *Id.* One of the officers noticed some small "brownish reddish" spots on Knox's left thigh and decided to take Knox to the sheriff's station. *Id.* At the station, one of the officers found a set of keys in Knox's back pocket, which were later determined to be the victim's missing house and car keys.

¶228. An Amite County grand jury indicted Knox for capital murder while in the commission of a robbery pursuant to Miss. Code Ann. § 97-3-19. *Id.* After a trial, the jury found him guilty of capital murder and sentenced him to death. *Id.* Knox appealed, claiming, inter alia, that the State presented insufficient evidence of the underlying crime of robbery. *Id.* at 531. We upheld the conviction, stating:

It is not necessary that the victim be deprived of property prior to death to sustain a conviction for robbery. *West v. State*, 463 So. 2d 1048, 1056 (Miss. 1985). "An indictment charging a killing occurring 'while engaged in the commission of [robbery]' includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *West v. State*, 553 So. 2d 8, 13 (Miss. 1989). *See also* *Turner v. State*, 732 So. 2d 937, 950 (Miss. 1999). "Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case." *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974). Fully considering the crime in question, the location of Spears' body in the trunk of her car, and the keys to that car in Knox's possession even after he changed his clothes, it is clearly a question for the jury whether Spears was robbed or whether it was Knox's intent to rob her. Unquestionably, the proof demonstrates that Spears was strangled which caused large amounts of blood to accumulate in her lungs, which would have resulted in a slow, heinous death. A blood trail led from a spot in her garage to the trunk of her car, with no sign of entry into her home, all of which indicates that Knox took the keys from Spears's person while she was in the garage. Furthermore, it is most significant that Knox was in possession of Spears's car and house keys - her personal property - at the time he was arrested. Miss. Code Ann. § 97-3-73 clearly establishes the necessary elements for proof of robbery, including the taking of personal property of another. The Legislature did not place a value in determining what constitutes personal property of another. Had the Legislature intended otherwise it would have so stated in the statute. This Court has stated, "The taking of property was the element relevant to establish each charge regardless of its value." *Holly v. State*, 671 So. 2d 32, 45 (Miss. 1996). Thus, the fact that Knox took only the victim's house and car keys which were of mere nominal value is of no great concern.

805 So. 2d at 531-32. This Court concluded its analysis of the robbery issue by stating:

Here, the elements of robbery by theft of house and car keys, the underlying felony, was clearly established and proven beyond a reasonable doubt. Again, when the defendant is discovered with the personal property of the deceased on his person it is entirely within reason for the jury to find that this fact in itself constitutes robbery. It is also within the jury's province to conclude that Knox killed Spears intending to take her car and that he either failed to do so or intended to return at a later time.

*Id.* at 532.

84

¶229. Thus, our jurisprudence clearly establishes that the trial court did not err in sending the question of robbery to the jury in this case, and the jury was within its discretion to find Goff guilty of the robbery and, consequently, the capital murder.

**CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., JOIN THIS OPINION.**

**RANDOLPH, JUSTICE, SPECIALLY CONCURRING:**

¶230. The dissent authored by my respected colleague, Justice Kitchens, incorrectly suggests that the majority fell far short of the level of a thorough and objective analysis, while only claiming to examine with heightened scrutiny, versus an actual heightened scrutiny. Heightened scrutiny for appellate review does not alter or elevate the burden of proof beyond a reasonable doubt. The dissent's implication that the majority failed to honestly call "a ball a ball and a strike a strike" is not only incorrect, but in error. These criticisms do little to advance the administration of justice.

¶231. Had my colleague been the twelfth juror, he very well may have swayed the other jurors to look through the lens prescribed in his dissent. Perhaps his skillful arguments would have convinced them to conclude a capital offense had not occurred. However, as succinctly laid out in the majority opinion, buttressed by Justice Dickinson's excellent concurrence, the facts presented to the jury in the guilt phase were sufficient to support its finding of capital murder. The law does not require jurors to find guilt beyond all doubt, i.e.,

absolute certainty, but rather only beyond a reasonable doubt. This allows a zone of residual doubt to exist without offending notions of fairness and justice.

¶232. The dissent decries that the record is devoid of credible evidence on the question of robbery, asserting not "a sliver of evidence" supports the jury's determination. To support this assertion, the dissent states that we know from the record that Mrs. Yates took her wallet into the motel office, and returned to the car with the wallet. Dis. Op. ¶252. Having read the record multiple times, I find no such testimony. The desk clerk, Pearl Boulware, never referred to Yates using a wallet at check-in. The desk clerk, Pearl Boulware, never referred to seeing a wallet. (Record at 468-75).

¶233. Next, the dissent finds significance in the "absence of biological matter on the wallet, . . ." According to the dissent, this absence "suggests more heavily than not, that the wallet was absent . . . ." Dis. Op. ¶255. An interpretation which fails to appreciate that other physical evidence found in the defendant's car showed no evidence of biological matter.

¶234. The dissent concludes that the penalty should be life, as opposed to death. The jurors, who were already satisfied beyond a reasonable doubt that the State proved robbery, heard additional evidence during the sentencing phase. The jury was required to consider whether any one of five elements of aggravation existed, in determining whether the death penalty should be imposed. The sentencing instruction required a separate finding by the jury, once

again beyond a reasonable doubt, that one or more of the aggravating circumstances existed, before it could return a death penalty sentence.

¶235. In its consideration of aggravating circumstances, with additional evidence before them, the jury once again concluded unanimously that one of the aggravating circumstances, among others, was:

> (3) [t]he capital offense was committed while the defendant was engaged in the commission of robbery.

¶236. Before the jury made its ultimate decision, any vestige of doubt regarding the whereabouts of the money found in the wallet[36] was answered by the testimony of the defendant's mother, who testified that on the night of the crime, the defendant was at her house. He talked on the phone twice. During the second call, she listened to the conversation on another phone. Goff was talking to a woman, and "the girl said, 'Joseph you can't just put me in a motel and go off and leave me.' 'I'm hungry.' And he said, 'I left you $500.00.' And she said, 'But there's nothing to eat here.'"

¶237. The defendant's own words belie the dissent's alternative reasonable inference theory. There has been no miscarriage of justice. There is overwhelming evidence of guilt. The majority reviewed this case under the required heightened scrutiny standard. The majority concluded that there was substantial evidence in support of the result, and it cannot fairly be said that no reasonable juror could have found otherwise.

---

[36]More precisely, the money found in defendant's fleeing auto.

¶238.  I choose to follow the view announced by Chief Justice Burger of the United States Supreme Court for that Court not to retry cases de novo on appeal, nor to close my eyes to the reality of overwhelming evidence of guilt fairly established.  *See Milton v. Wainwright,* 407 U.S. 371, 377, 92 S. Ct. 2174, 2178, 33 L. Ed. 2d 1, 6-7 (1972).

**CARLSON, P.J., DICKINSON, LAMAR AND PIERCE, JJ., JOIN THIS OPINION.**

**WALLER, CHIEF JUSTICE, DISSENTING:**

¶239.  In my view, while I agree with the majority conclusion regarding the sufficiency of the evidence, the record supports two or more hypotheses of the crime committed and therefore the circumstantial evidence (two-theory) instruction D-14 should have been given to the jury.  For this reason, I respectfully that because the trial court erred when it failed to grant instruction D-14, a circumstantial evidence (two-theory) instruction, the trial court's judgment case must be reversed and this case remanded for a new trial.  I write separately to address this point.

*Circumstantial evidence (two-theory) instruction*

¶240.  The evidence in this case is purely circumstantial.  *See  Lynch v. State*, 877 So. 2d 1254, 1265 (Miss. 2004) (quoting *State v. Rogers*, 847 So. 2d 858, 863 (Miss. 2003) (For purposes of granting a two-theory instruction, "[a] circumstantial evidence case . . . . is one in which there is neither an eyewitness nor a confession to the crime.").  Goff gave no confession nor were there any eyewitnesses.  The State and Goff concede as much.

88

¶241. Two instructions are required in circumstantial evidence cases such as this. The first has been termed the "typical circumstantial instruction," which requires the jury to exclude every reasonable hypothesis other than guilt. We have stated:

> A jury is instructed to exclude every other reasonable hypothesis than that of guilt when a case is based entirely upon circumstantial evidence. A circumstantial evidence instruction is required only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant.

*Hughes v. State*, 983 So. 2d 270, 278 (Miss. 2008) (citations omitted). This type of instruction was given in S-2A, and no issue exists about its propriety.[37]

---

[37] Instruction S-2A provided:

The Defendant, Joseph Bishop Goff, has been charged in the indictment with the crime of Count I: Capital Murder for having killed Brandy S. Yates during the commission of the felony crime of Robbery of Brandy S. Yates.

If you find from the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence:

(1) Joseph Bishop Goff, on or about August 27, 2004, in George County, Mississippi;
(2) did willfully, unlawfully, feloniously and without authority of law and not in necessary self-defense;
(3) with or without any design to effect the death, kill and murder Brandy S. Yates, a human being;
(4) at a time when Joseph Bishop Goff was engaged in the commission of the felony crime of Robbery, by taking the personal property of Brandy S. Yates in her presence or from her person against her will by violence to the person of Brandy S. Yates;

If the State has failed to prove any one or more of the above elements beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, then you shall find the Defendant, Joseph Bishop Goff not guilty of Capital Murder.

89

¶242. The circumstantial evidence instruction that was not given is known as the circumstantial evidence (two-theory) instruction. While the propriety of this instruction has been questioned in the past, I believe that, in certain instances, the instruction must be given to secure protection of an accused's right to a fair trial. *See **Stringfellow v. State***, 595 So. 2d 1320, 1322 (Miss. 1992). The instant case is such an occasion.

¶243. The designation "two-theory" is a misnomer. A better name would be a "two-interpretation" instruction, where the evidence can be argued, as in this case, to either implicate Goff or to absolve Goff of the robbery of Brandy. The two-theory instruction does not offer the jury the choice between two distinct theories for the murder, i.e., whether Goff committed the murder or someone else committed the murder. The two-theory instruction is not used to advance two distinct theories such as "murder or alibi; homicide or an accident; homicide guilt or mistaken identity," as was addressed in ***Kitchens v. State***, 300 So. 2d 922, 926 (Miss. 1974).

¶244. Here, the jury had to exclude the reasonable hypothesis that Goff did not take the wallet. Under the State's theory, Goff stole the wallet as part of the murder. On the other hand, the facts show that Brandy was driving when she and Goff checked into the Rocky Creek Inn. It is plausible that Brandy left the wallet in the car, and thus the wallet was not taken into the motel room. Goff could have killed Brandy in a rage and driven away in the Mustang, unaware that Brandy's wallet was in the vehicle.

¶245.  In ***Jones v. State***, 797 So. 2d 922 (Miss. 2001), this Court reversed and remanded for a new trial the capital-murder conviction of Kenneth Earl Jones for failure to give the two-theory instruction where the evidence was wholly circumstantial.  We stated:

> In a case where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant two jury instructions.  First, the court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict.  As stated previously, the trial court in this case did grant the typical circumstantial evidence instruction.  However, in addition to giving instruction on circumstantial evidence, the trial court must grant a "two-theory" instruction such as D-7.  In the case at bar, the trial court refused to allow D-7, the two-theory instruction. The very same two-theory instruction as D-7 was at issue in ***Henderson***. This Court reversed and remanded for a new trial because the trial judge refused the two-theory instruction as well as the typical circumstantial evidence instruction.

*Id*. at 928-29 (citations omitted).  *See also **Parker v. State***, 606 So. 2d 1132, 1142 (Miss. 1992) ("Because the trial judge refused to grant a two theory instruction offered by the defense in this case, the trial judge abused his discretion and this case must be remanded."); ***Henderson  v. State***, 453 So. 2d 708, 710 (Miss. 1984) ("[T]his case should be remanded for a new trial because jury instructions required in a circumstantial evidence case were refused."); ***Nester v. State***, 254 Miss. 25, 29, 179 So. 2d 565, 566 (1965) (case  reversed and remanded, as "[t]he evidence . . . was so circumstantial as to require the giving of the two-theory instruction and it was prejudicial error for the court to refuse it.").

¶246. Instruction D-14, offered by Goff as a circumstantial evidence (two-theory) instruction, is as follows:

91

The Court instructs the jury that if there may be a fact or circumstance in this cause susceptible of two interpretations, one favorable and the other unfavorable to the Defendant, and when the jury has considered such fact or circumstance with all other evidence, there is a reasonable doubt as to the correct interpretation, then you, the jury, must resolve such doubt in favor of the Defendant, and place upon such fact or circumstance the interpretation most favorable to the Defendant.

¶247. This instruction is very similar to other instructions approved by this Court, but was refused by the trial court. *See Hughes,* 983 So. 2d at 278.

¶248. When the trial court considered instruction D-14, the following exchange occurred:

BY THE DISTRICT ATTORNEY: We object to D-14, Your Honor. I think this is a circumstantial evidence case, and that has been defined in the elements instruction. It's improper under the law to give this instruction.

BY COUNSEL FOR GOFF (McNALLY): And Judge, we feel this is a two-theory case based on circumstantial evidence as far as the murder and the robbery. We feel this charge is appropriate under Mississippi law.

. . .

BY THE COURT: . . . I don't think you're entitled to this and a circumstantial evidence instruction when the burden of proof is used in the elements instruction. D-14 will be refused.

¶249. The law is clear–because the evidence in this case is purely circumstantial, the jury should have received both the typical circumstantial evidence instruction, as well as the circumstantial evidence (two-theory) instruction. In this case, only the typical circumstantial evidence instruction was given.

¶250. As the jury was not fully and fairly instructed due to the trial court's failure to grant instruction D-14, I would reverse the trial court's judgment and remand this case for a new trial. *See Jones*, 797 So. 2d at 929.

**GRAVES, P.J., JOINS THIS OPINION.**

**KITCHENS, JUSTICE, DISSENTING:**

¶251. Were this case before us an appeal from a conviction of robbery and robbery alone, we would use very little ink to reverse and render for lack of evidence. The three elements of robbery are (1) the intentional (2) taking and carrying away of another's property from his person or presence (3) effectuated by force or threat of force. *Crocker v. State*, 272 So. 2d 664, 665 (Miss. 1973). It is fundamental criminal law that every element of a criminal statute must be properly pled and sufficiently proven in order to permit conviction thereunder. *Taggart v. State*, 957 So. 2d 981, 985-86 (Miss. 2007) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)). On challenges to the sufficiency of the evidence, we review the evidence in the light most favorable to the jury's verdict, *Gleeton v. State*, 716 So. 2d 1083, 1087 (Miss. 1998), but "if we determine the evidence points in favor of the defendant on any element of the offense such that a reasonable juror could not have found the defendant guilty beyond a reasonable doubt, we must reverse the conviction." *Coleman v. State*, 947 So. 2d 878, 881 (Miss. 2006) (citing *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)).[38]

_____

[38] "A motion for directed verdict challenges the legal sufficiency of the evidence offered *to that point* of trial to sustain a guilty verdict." *Morris v. State*, 777 So. 2d 16, 22 (Miss. 2000) (emphasis added). Therefore, any evidence procured after Goff's second motion for a directed verdict during the guilt phase of his trial cannot enter in to our

93

¶252. In order to sustain Goff's conviction of capital murder, we must find that the evidence supports the determination that he committed murder *and* the underlying crime of robbery. Miss. Code Ann. § 97-3-19 (Rev. 2006). On the question of murder, the evidence clearly is sufficient to sustain the conviction. On the question of robbery, though, the record is utterly devoid of credible evidence that sufficiently proves a felonious taking of Brandy Yates's wallet. We know from the record that Mrs. Yates took her wallet into the motel office when she paid for the room that she was to share with Goff.[39] We also glean from the record that she returned from the office to the car, of which she was the driver at that time, with the wallet. The next appearance the wallet makes in the record is its discovery in the area of the

decision. In my view, today's majority opinion contains no suggestion to the contrary, nor do the separate opinions of the Chief Justice and Justice Dickinson.

[39] Justice Randolph contends that the evidence does not support this establishment of a link between Mrs. Yates and her wallet. With humility, I disagree. Pages 468 through 474 of the record document the direct examination of Ms. Pearl Boulware, who managed the front desk of the Rocky Creek Inn on the afternoon and evening of Aug. 26, 2004. Ms. Boulware recounted checking Mrs. Yates into the motel, ascertaining Mrs. Yates's method of payment, and reviewing Mrs. Yates's drivers license. Justice Randolph correctly notes that the word "wallet" was absent from this account, but the description was detailed enough to lead District Attorney Tony Lawrence to claim in his response to Goff's first motion for a directed verdict, in a statement memorialized on page 819 of the record, that "[t]he evidence also showed that [Mrs. Yates] used that wallet to check into the hotel at approximately 4:00 p.m." Obviously, this statement was not evidence, but it was a reflection of the evidence with which the trial judge clearly agreed in denying Goff's motion. In my view of this unique case, this interpretation of the evidence was reasonable. Given our obligation to review denials of motions for directed verdict with the evidence cast in the light most favorable to the jury's verdict, *Gleeton*, 716 So. 2d at 1087, I am satisfied that the State demonstrated that Mrs. Yates possessed the wallet when she arrived at the Rocky Creek Inn. A conclusion to the contrary is one with which I would not agree; but that determination would appear to obligate one to the judgment that the State failed to prove that Mrs. Yates *ever* possessed the wallet, and a judge holding that opinion would be obligated to reverse Goff's conviction.

car's console, by police, the next day. The State provided no evidentiary basis on which the jury could conclude that the wallet ever entered the motel room, where it could have been taken from the victim's person or presence, as is indisputably required by the robbery statute.

¶253.   The State was unable to produce an eyewitness to the atrocities that were visited upon Mrs. Yates by her cruel assailant. No one confessed to killing her or robbing her of her wallet. Therefore, this is a case resting entirely upon circumstantial evidence, and as such requires proof of the defendant's guilt, both as to murder and robbery, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence to sustain a conviction of capital murder. *Hughes v. State*, 983 So. 2d 270, 278 (Miss. 2008). This fundamental requirement goes all but unaddressed by today's majority opinion, and the Court's mere passing references to it fall far short of the level of thorough and objective analysis that should characterize opinions from Mississippi's highest court, especially in capital cases, which we claim to examine with heightened scrutiny. *See* Maj. Op. at 29, 32, 38. *See also Bennett v. State*, 990 So. 2d 155, 158 (Miss. 2008).

¶254.   In the present case, the record plainly reveals that the State adduced evidence that excludes every reasonable hypothesis consistent with Goff's innocence on the charge of murder. As to the allegation of robbery, the State's proof fell far short of that evidentiary standard. This Court's duty, in these circumstances, is clear: we must be at least as honest as we expect a home plate umpire to be and call a ball a ball and a strike a strike.

95

Notwithstanding the State's admirable diligence, a ball was thrown on the robbery aspect of this case, though the prosecution was well within the strike zone on the murder aspect.

¶255. Even unto the rendering of today's judgment, the State has been unable to point to a sliver of evidence that supports the jury's robbery determination. When we held oral arguments on this case in January, we put this very question to the State's able counsel, who candidly acknowledged that no evidence was adduced at trial to the effect that Mrs. Yates's wallet was in the motel room during the commission of this heinous homicide. Therefore, a jury could not have determined beyond a reasonable doubt, let alone to the exclusion of every reasonable hypothesis consistent with Goff's innocence of robbery, that Mrs. Yates's wallet was in her presence at the time of her murder. Indeed, given the absence of biological matter on the wallet, the evidence suggests more heavily than not that the wallet was absent from this hellish murder scene. *See* Maj. Op. at 12.

¶256. The evidence does not, of course, altogether eliminate the possibility that Goff stole the wallet in the same continuous transaction that led to Mrs. Yates's death. As the majority correctly asserts, the record in this case does lend itself to the hypothesis that Mrs. Yates did, in fact, take her wallet with her from Goff's car into the motel room and that Goff later robbed her of this article of personal property. I agree that this hypothesis, obviously consistent with guilt, is a reasonable one, and the jury could reasonably have inferred it from the evidence. The proof in this case, however, falls far short of excluding all reasonable hypotheses consistent with innocence of robbery, because the location of the wallet during

Goff's barbaric act is a fact to which the evidence does not speak. Based upon the evidence and the evidence alone, it is just as reasonable, if not more reasonable, to infer that the wallet remained in the car as Goff returned to Alabama, while he perpetuated this brutal murder, and during his flight from the crime scene. Such an hypothesis clearly is reasonable and consistent with innocence of robbery. Yet the majority declines to analyze this hypothesis. If it did, this fatal flaw in the State's case would be exposed as irreparable, a deficiency that would mandate reversal of Goff's conviction for capital murder.

¶257. Finding that such an analysis leads to the inescapable conclusion that the evidence is insufficient to exclude every reasonable hypothesis consistent with Goff's innocence of the crime of robbery, I would reverse the capital murder conviction, affirm the conviction for the lesser-included offense of murder, and remand to the trial court with instructions to resentence Goff accordingly. *See **Wheeler v. State***, 536 So. 2d 1341 (Miss. 1988).

**CHANDLER, J., JOINS THIS OPINION.**

## APPENDIX

## <u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

i

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). \*remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

\***Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

\***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

\***Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

**Stringer v. State**, 454 So.  2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

**Wilcher v. State**, 448 So. 2d 927 (Miss. 1984).

**Caldwell v. State**, 443 So. 2d 806 (Miss. 1983).

**Irving v. State**, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE**
**AND SENTENCE PHASE**

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 1291 (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).


*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).


*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).


*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).


*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.